Norman Johnson, Suing on Behalf of Himself and All Other Stockholders of Gold and Stock Telegraph Company Similarly Situated, Appellant, *v.* Western Union Telegraph Company et al., Respondents.

Argued June 6, 1944; decided October 12, 1944.

380

*Arthur Garfield Hays* and *Alan S. Hays* for appellant.   I. The
terms of the lease require Western Union to assume and pay

all Federal income taxes duly assessed against Gold & Stock Company. (*Gold & Stock Telegraph Co.* v. *Commissioner of Int. Rev.*, 83 F. 2d 465; *Filipowicz* v. *Rothensies*, 31 F. Supp. 716; *United States* v. *Canfield*, 29 F. Supp. 734; *Matter of Rosenberg*, 269 N. Y. 247; *United States* v. *Taft*, 44 F. Supp. 564; *In re Gerry*, 112 F. 958; *Outlet Embroidery Co.* v. *Derwent Mills*, 254 N. Y. 179; *Georgia Ry.* v. *R. R. Comm.*, 262 U. S. 625; *Galveston Elec. Co.* v. *Galveston*, 258 U. S 388; *Pittsfield N. A. R. Corp.* v. *Boston & A. R. Co.*, 260 Mass. 390; *Whitlock* v. *Boston & M. R. R.*, 29 F. 2d 351.) II. The judgment should be reversed because the courts below failed to order Western Union to segregate moneys belonging to Gold & Stock Company. (*Cabaniss* v. *Ponder*, 65 Ga. 134; *Frier* v. *J. W. Sales Corp.*, 261 App. Div. 388; *Fur & Wool Trading Co., Ltd.* v. *Fox, Inc.*, 245 N. Y. 215; *In re Leavitt & Grant*, 215 F. 901; *In re Hollins & Arrousez Electric & Engineering Co.*, 31 F. 2d 50.) III. The affirmative defenses are invalid. (*Pollitz* v. *Wabash Railroad Co.*, 150 App. Div. 715, 207 N. Y. 113; *Runcie* v. *Corn Exchange Bank*, 6 N. Y. S. 2d 616; *Dickerman* v. *Northern Trust Company*, 176 U. S. 181; *Zebley* v. *F. L. & T. Co.*, 139 N. Y. 461; *Hutton* v. *Smith*, 74 App. Div. 284, 175 N. Y. 375; *Marcus* v. *Village of Mamaroneck*, 258 App. Div. 328, 283 N. Y. 325; *Feldman* v. *Metropolitan Life Insurance Co.*, 259 App. Div. 123.)

*John F. MacLane* and *Benjamin C. Milner* for respondent. I. The sale of securities by Western Union was proper and lawful in all respects. II. Western Union is not required to segregate the proceeds of the sale of securities in trust or otherwise account for their use before the termination of the agreement, or on earlier default. (*Kennedy* v. *Porter et al.*, 109 N. Y. 526; *Manson* v. *Curtis*, 223 N. Y. 313; *Bovin* v. *Galitzka*, 250 N. Y. 228; *Wendel Foundation* v. *Moredall Realty Corp.*, 282 N. Y. 239.) III. Western Union is under no obligation or liability to pay Federal income taxes assessed against Gold & Stock. (*United States* v. *Warren R. Co.*, 127 F. 2d 134; *Brainard* v. *N. Y. C. R. R. Co.*, 242 N. Y. 125; *Woodruff* v. *Oswego Starch Factory*, 177 N. Y. 23; *Wendel Foundation* v. *Moredall Realty Corp.*, 282 N. Y. 239; *Hopwood Plays, Inc.,* v. *Kemper*, 263 N. Y. 380.) IV. In any event the action is barred by the Statute of Limitations, laches, ratification, acquiescence and estoppel.

(*Corash* v. *Texas Co.*, 264 App. Div. 292; *Chance* v. *Guaranty Trust Co.*, 282 N. Y. 656; *Potter* v. *Walker*, 276 N. Y. 15; *Pollack* v. *Warner Bros. Pictures, Inc.*, 266 App. Div. 118; *Calhoun et al.* v. *Millard et al.*, 121 N. Y. 69; *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159.)

DESMOND, J. On December 14, 1881, Gold and Stock Telegraph Company, on whose behalf plaintiff brings this suit, leased all its assets, tangible and intangible, to defendant for a term of ninety-nine years from January 1, 1882. The agreed rental was a sum equal to 6% per year (i. e., $300,000 per year) on the par value of the lessor's outstanding stock. That sum was to be paid quarter-annually, direct to the stockholders of the lessor. The lessee assumed and agreed to pay the whole of the lessor's outstanding bonded indebtedness, with interest. As part of the transaction, defendant-lessee indorsed on lessor's stock certificates a guarantee of payment of 6% annual dividends thereon. The lessor agreed to preserve its corporate existence and franchise and the lessee agreed to pay, in addition to rent, $2,500 per year to cover the expense of keeping lessor alive as a corporation. The scheme of the lease, as further described in subsequent paragraphs hereof, left the lessor with no property of any sort in its possession, no income except the agreed rental, and no actual money receipts from any source, since the rental installments were to go, for the whole ninety-nine years, direct to lessor's stockholders. It is plain beyond controversy that the intent was that the lessor corporation, thus left without any funds, property or actual income, was to have all its obligations, of every sort, discharged during the term of the lease, by defendant as lessee. In 1913, a Federal income tax law was passed. Who, under this lease, is obligated to pay the Federal income taxes now being assessed annually against the lessor?

Prior to the leasing, Gold and Stock Telegraph Company had carried on a " telegraph ticker service ". The lease here under scrutiny went beyond a mere letting of the physical properties theretofore used in that enterprise. The indenture listed, also, as leased assets, " the telegraph lines and business " of the lessor. Defendant was to have for itself all the revenues thereof. It agreed, at its own cost and expense, thereafter to " operate

the said lines and appurtenant facilities for business '' and to keep them in condition suitable for the transaction of the kind of business theretofore conducted by the lessor. Besides the rental provisions above alluded to, and covenants to which we shall refer hereafter, for keeping the property clear of taxes, incumbrances and liens, defendant promised in the lease to assume and pay '' all costs and expenses incurred in the operation and maintenance of the lines and business of the G. & S. T. Co. * * * ''. It was a complete, functioning business enterprise that was leased. At the end of the term, lessor was to have its properties back not only intact and in good condition, but '' as free from * * * encumbrance thereon as they were, when received ''. In so many words, defendant covenanted to keep the whole property and business of Gold and Stock Telegraph Company '' clear from all incumbrances arising from tax, assessment or judgment liens ''.

Federal income taxes are now being assessed annually against this lessor and remain unpaid. Those delinquencies result in liens on the leased property. (U. S. Internal Revenue Code, § 3670; U. S. Code, tit. 26, § 3670.) Those liens may attach only to the lessor's interest in the leased assets and may, as a practical matter, be enforcible by the Government only by a sale of the lessor's reversionary interest, but they are liens just the same. (See 45 Yale Law Journal, pp. 183, 184.) As has been authoritatively determined in respect to this very lease, those income taxes on the rents cannot be collected by the United States from lessor's stockholders nor can the lessee be required by the United States to withhold the taxes out of the rents. (*Western Union Tel. Co.* v. *Commissioner of Int. Rev.,* 68 F. 2d 16; *Gold & Stock Telegraph Co.* v. *Commissioner of Int. Rev.,* 83 F. 2d 465, certiorari denied 299 U. S. 564; see *United States* v. *Western Union Telegraph Co.,* 50 F. 2d 102.) Furthermore, it is held that, under this form of lease, each of the lessor's stockholders has an individual, direct claim against the lessee for his full and undiminished share of the annual rents; that share must be paid to the individual stockholder without interference by the lessor, the tax-collecting agency, or anyone else. (*Western Union Tel. Co.* v. *Commissioner of Int. Rev., supra; United States* v. *Northwestern Telegraph Co.,* 83 F. 2d 468, 469, certiorari denied 299 U. S. 565; see *Peabody* v. *Inter-*

*borough Rapid Transit Co.,* 124 Misc. 801, affd. 213 App;
Div. 857, affd. 240 N. Y. 708, also *Rensselaer & S. R. Co.* v.
*Irwin,* 249 F. 726.) The guarantee indorsed on the stock cer-
tificates has the same effect. Since the agreed rent must go
direct to lessor's stockholders without deductions, how can
lessee possibly fulfill its promise to keep the leased assets
unaffected by liens or incumbrances, unless it pays these income
taxes from its own funds?

Defendant's reliance is on the first part of the Sixth para-
graph of the lease. Therein it bound itself to pay " all taxes
and assessments which may be lawfully imposed upon said
property of the G. & S. T. Co., or any part thereof, by
any state or municipal authorities ". That language, says
defendant, marks out the limit of its tax burden under the
lease. If that were so, and if the lease said nothing else
on the subject, the lessor's Federal income taxes could not
be charged against the lessee. Those income taxes are not
taxes on " property " but are a levy in personam and they
are of course, not imposed by " state or municipal authori-
ties " (*Brainard* v. *N. Y. C. R. R. Co.,* 242 N. Y. 125; *Van
Rensselaer* v. *Dennison,* 8 Barb. 23). But the same Sixth
paragraph of the lease contains also an explicit promise by
defendant to " keep the same [leased property] clear from all
incumbrances arising from tax, assessment or judgment liens ".
If State and municipal taxes alone had been under considera-
tion, they would have been covered adequately by the express
provision at the beginning of the Sixth paragraph, for the
payment by the lessee, of such imposts. The later provi-
sion, in the same paragraph, as to keeping the property free
from *all* tax or judgment liens must have been meant to be
all-inclusive (see *Schlafly* v. *D'Arcy,* 1 F. 2d 297). Applicable
here is the language of this court in a different situation:
" these words are sufficient to cover, and must have been
intended to cover, all possible forms of taxation " (*Ward* v.
*Union Trust Co.,* 224 N. Y. 73, 79, quoting from *Walker* v.
*Whittemore,* 112 Mass. 187).

We are mindful of the general rule that a lessor must ordi-
narily pay his own income taxes on his rents. We have not
overlooked the long line of cases rejecting demands of lessors
for payment of such taxes by their lessees. But those were

cases where the taxes which the lessee promised to pay were in one way or another specified in the lease, in terms which excluded the idea of income taxes. (See, for instance, *Boston & Providence R. R.* v. *Old Colony R. R.,* 269 Mass. 190; *Stony Brook R. R.* v. *Boston & Maine R. R.,* 260 Mass. 379; *Catawissa R. R. Co.* v. *Phila. & R. Ry. Co.,* 255 Penn. St. 269; *Sharon Railway Co.* v. *Erie R. R. Co.,* 268 Penn. St. 396; *Woodruff* v. *Oswego Starch Factory,* 177 N. Y. 23.) All of the decisions just above cited turn on limiting language in the leases themselves. In each of those cases the lessee's promise was not to pay all taxes or to remove all tax incumbrances but only to pay taxes specified. Likewise inapplicable here are the decisions which pass on language which amounts to specific promises to pay lessors' income taxes or taxes imposed on the rents (e. g., *Peart* v. *Phipps* [1807], 4 Yeates 386 [Penn.]; *Suter* v. *Jordan Marsh Co.,* 225 Mass. 34; *Phila. C. P. Ry. Co.* v. *Phila. R. T. Co.,* 263 Penn. St. 561; *Wendel Foundation* v. *Moredall Realty Corp.,* 282 N. Y. 239). We are here enforcing covenants which with utter clarity and positiveness bind the lessee to keep the property free from all tax liens and to return it to the lessor in that unblemished state.

Defendant cites *Brainard* v. *N. Y. C. R. R. Co.* (*supra*), as holding that, to impose on a lessee liability for his lessor's income taxes, the lease itself must refer to " income taxes ", in so many words. The *Brainard* decision goes to no such extreme. Under construction in that lawsuit was a contract of lease (or management) quite unlike the one we are construing here. The lessee in the *Brainard* case had covenanted to pay all taxes " on the said road or property, or upon the said Mahoning Company [the lessor], by reason of its ownership thereof". (p. 129-130.) This court held that the quoted language described only property taxes, not income taxes. There was in that lease no general, all-inclusive promise to take care of all tax liens. This court in the *Brainard* case did " adopt " from a Federal decision the rule that imposition on a lessee of a lessor's income taxes is not justified " unless the lease expressly provides for the payment of taxes on the income from rentals received under the lease". (p. 132.) But the *Brainard* opinion does not say or mean that the income tax had to be mentioned by name. The holding of the case is that words

which are commonly used only to describe property taxes cannot fairly be construed to include income taxes. If the very words " income taxes " had to be used, then it would be impossible to draw a covenant as to the payment of all taxes, now or in the future to be imposed. Taxes, like death, are certain, but no one knew in 1881, when this lease was drawn, what forms of taxation would be popular ninety-nine years thence. There was no legal impediment to an assumption by the parties of all the risks of changes in the tax laws. (See *Ward* v. *Union Trust Co.*, 224 N. Y. 73, at p. 79, *supra*.) The lessee assumed the risk of new and larger taxes, the lessor took the chance that taxes would be reduced.

Our close examination of the particular language of this instrument does not mean that we are picking out words or phrases from a whole text. The very same result is reached when we seek out the general plan of the contract. That plan contemplated the turning over free and clear of liens, to the lessee, of all lessor's property and its return in the same condition. It contemplated the constructive payment of the rent to the lessor but actual payment thereof in undiminished amount to lessor's stockholders, with an absolute guarantee thereof running from the lessee to the stockholders and, finally, a stripping from the lessor of all funds, principal or income, and the assumption by the lessee of responsibility for all costs and expenses which ordinarily would be charged to the lessor and for the removal from the property of every tax or other lien and incumbrance. To say that such a scheme left the matter of possible income taxes suspended in the air till the long distant day of the lease's end, is to accuse the parties of folly.

Argument is made, however, that the parties should not be held to have had Federal income taxes in contemplation, since no such taxes were being imposed in 1881. We do not see what difference it makes whether or not the parties had in mind that specific kind of governmental exaction, so long as the lease imposed on the lessee all risk and burden of any and every kind of tax levy. Nor can it fairly be said that income taxes were totally outside the range of vision of these contracting parties in 1881. Our present form of Federal income tax dates only from 1913, but income taxes were imposed by our national government as early as 1861. One of our own decisions tells

us of a lease drawn in 1871 wherein the draftsman specifically excluded income taxes from the taxes to be borne by the lessee. *(Rensselaer & Saratoga R. R. Co. v. D. & H. Co.,* 168 App. Div. 699, affd. 217 N. Y. 692, see discussion of the same lease in *Rensselaer & S. R. Co.* v. *Irwin,* 249 F. 726, *supra.)* There were income tax laws in the American colonies, in Great Britain beginning in 1798 and in various States of the Union long before this lease was signed. (See The Income Tax, by Seligman [The Macmillan Co., 1914].) New York State had a tax on rents as early as 1846. (See *Woodruff* v. *Oswego Starch Factory,* 177 N. Y. 23, *supra,* and *Van Rensselaer* v. *Dennison,* 8 Barb. 23, *supra.)* A prudent lessor and a careful lessee, scanning the horizon in 1881 for possible future taxes, could have descried an income tax among the shapes of things to come.

We do not here analyze the opinion of the Second Circuit Court of Appeals in *United States* v. *Warren R. Co.,* 127 F. 2d 134, since the court itself, in its mandate in that case, was at pains to point out that the decision was " not res adjudicata " as between lessors and lessee on the question of whether or not the lessee " is obligated to bear and pay income taxes of such lessors ". The holding of that case went only so far as to relieve the lessee from direct liability to the Federal government for the lessor's income taxes.

This is not a case where the meaning of doubtful language has been conclusively determined, as a question of fact, by the two courts below. Here, as in the *Brainard* case *(supra),* the language of the tax covenant is so clear and definite as to admit, as matter of law, of one construction only. As Judge Pound wrote in the *Brainard* case (242 N. Y. at p. 133) : " the construction of a plain contract is for the court."

Besides his demand that the lessee be required to pay the income taxes, plaintiff asks that defendant be required to segregate a certain sum derived from the sale by defendant of securities which are part of the leased assets. We are in agreement with the courts below, that defendant is under no duty so to segregate those funds.

The answer sets up alleged defenses as to the Statute of Limitations and as to ratification by lessor's stockholders, etc. Since those defenses were not passed upon by the courts below,

they cannot be passed on by us now. The case must, accordingly, go back for a new trial.

The judgments should be reversed and a new trial granted, with costs to abide the event.

CONWAY, J. (dissenting). This is a stockholder's derivative action in which it is sought to so construe a contract made more than 60 years ago that the lessee thereunder may be directed to assume and pay the Federal income taxes of the lessor upon the rent received by it. There is no mention of Federal taxes in the lease and no one came forward to testify that it was the intention of the contracting parties that such taxes should be paid by the lessee. The plaintiff, however, in pleadings and proof went beyond the terms of the contract in an attempt to establish factually such intention. He pleaded and proved a guarantee by the Western Union Telegraph Company (hereinafter referred to as W. U.) to the stockholders of Gold and Stock Telegraph Company (hereinafter referred to as G. & S.) to pay quarterly 1½% upon the par value of the stock represented by the certificates, which guarantee was not provided for in the contract of lease. The plaintiff also showed by the minutes of the annual meeting of G. & S. on October 12, 1881 (two months before the contract of lease was executed) the capital stock, bonded indebtedness, net profits for the preceding year, the dividends and interest paid, the amount paid for construction of lines and purchase of patents and the amount and manner of the investment of surplus for the year.

G. & S. then proved the care with which the contract of lease had been negotiated. There had been a committee of three from W. U. and one from G. & S. Originally W. U. had sought a lease in perpetuity of all the property and possessions of G. & S. at an annual rental of 6% upon the outstanding stock of $5,000,000. That apparently was changed at the first meeting of the two committees to an offer to lease at a rental of "6% per annum payable quarterly, guaranteed, for the term of 99 years" upon the capital stock. That offer was rejected but the door left open for further negotiations and attention called to the dividend-paying assets of G. & S. Thereafter W. U. made a new offer in these words: "Lease at 6 per cent. For 99 years with option of Western Union Telegraph Company

to terminate at end of 15 years — Gold & Stock to pay all liabilities and be entitled to divide all cash assets accruing as earned and on sale and transfer of telephones and royalties thereon to January 1st, 1882. Stock assets and franchises all to be turned over.'' Later W. U. added a provision that the G. & S. treasury stock, amounting to par value of $105,600, be distributed to G. & S. stockholders as part of the cash assets.

Thereafter at a meeting of the board of directors of G. & S. the modified offer of W. U. was spread upon the minutes as we have just set it out and accepted on condition that W. U. eliminate the provision for termination of the agreement at the end of 15 years at the option of W. U. and provided W. U. assumed the payment of the outstanding bonded debt of G. & S. amounting to $434,700 with interest from January 1, 1882. Those modifications were accepted by W. U. and a contract in conformity drawn, ratified and executed on December 14, 1881. Two weeks later on December 27, 1881, the minutes of the board of directors of G. & S. show that W. U. was requested to indorse the obligation for the rental on the stock certificates of G. & S. and that was later done.

On that proof it was clear to the point of demonstration that no one on either committee and none of the counsel drafting the contract mentioned or had in mind Federal income taxes. The contract followed the lines of the negotiations and so clear is it that there was no intention of the parties which was undisclosed by the words of the agreement and that there was no mistake made therein, that plaintiff has here sought no reformation of it.

On that state of the record as to what was in the minds of the parties, this court may not reverse the construction of the contract by the trial court and the Appellate Division unless we can say that no reasonable man could adopt it.

The contract is simple in its provisions. There was leased to W. U. the telegraph lines and business of G. & S. including franchises, easements, stock in other telegraph and telephone companies, inventions and patents with possession thereof from January 1, 1882, for 99 years with '' full right and authority to use, operate and enjoy the same and all and every part thereof as fully as the G. & S. T. Co. might have done had this Agreement not been executed; * * *.'' G. & S. covenanted

and agreed that the property leased and conveyed was " free. from all *debts* or *encumbrance* (except its *bonded debt* as hereinafter mentioned)." W. U. agreed to pay as rental " for said lines, business and other property hereby leased, a sum equal to six (6) per centum per annum on said capital stock of Five millions of dollars ($5,000,000) to wit, the sum of Three hundred thousand dollars during each and every year of the term of this agreement; payments thereof to be made in equal quarterly installments * * *; the G. & S. T. Co. hereby authorizing and requesting the W. U. T. Co. to make the said quarterly payments of rental during the term of this agreement; so fast as the same shall accrue and become payable; by distribution pro rata among the several stockholders of the G. & S. T. Co., as they may appear upon the books of the G. & S. T. Co., at the date of payment; the *G. & S. T. Co.*, hereby agreeing to *accept such distribution* among its said stockholders as *full payment* by the W. U. T. Co., * * * And the W. U. T. Co. further agrees to pay to the G. & S. T. Co., as an addition to the said rental, the further sum of Two thousand five hundred dollars ($2,500) per annum, during the term hereof, the same to be used by the officers of the G. & S. T. Co. as and for an administration fund for the purpose of defraying the necessary expenses of maintaining the organization of the G. & S. T. Co. as a corporation, and the payment of the same to be made in such manner and at such times as the officers of the G. & S. T. Co. may desire."

G. & S. had the option of terminating the agreement and resuming possession of the lines, business and property on default but W. U. remained liable nevertheless upon all of its covenants including the payment of rent. It was further covenanted and agreed that, upon any such surrender and restoration to G. & S., the lines and property should be in as good condition as when received by W. U. " and as free from *bonded debt or other encumbrance* ".

Then we come to the Sixth paragraph which is the one construed by the trial court after the taking of the testimony to which reference has been made: " Sixth: The W. U. T. Co. will also assume and pay all taxes and assessments which may be lawfully imposed upon said property of the G. & S. T. Co., or

any *part* thereof, by any state or municipal authorities during the continuance hereof, and also all costs and expenses incurred in the operation and maintenance of the lines and business of the G. & S. T. Co., and will keep the same clear from all incumbrances arising from tax, assessment or judgment liens or from any act of the W. U. T. Co. during the term hereof, and will also institute and, maintain such proceedings if any, as may be necessary to protect and preserve said property and any franchises of the G. & S. T. Co.''

It is apparent that this was a one sentence paragraph in which the parties had in mind the payment of taxes and assessments imposed by State or municipal authorities. A break-down of the sentence into parts, only confirms that fact. It will aid us in that break-down if we remember that this is not an action upon a guarantee to an individual stockholder by W. U., for the contract said nothing about any guarantee. Such an action would not be a derivative one but by an individual stockholder and subject to defenses as to him. We may not construe paragraph '' Sixth '' in one fashion because there was a guarantee not mentioned in the contract and yet indicate that we would not so construe it had there been no guarantee, for it is the language of the contract we are construing and the contract did not provide for a guarantee. With that in mind we now take paragraph '' Sixth '' in detail.

By it W. U. assumed to pay taxes and assessments upon what? Upon the *property* or any *part* thereof of G. & S. imposed by any *State* or *municipal* authorities during the term of the agreement of lease. There was there nothing said about judgment liens. This was the substantive assurance of payment. What else? '' And also '' all costs and expenses incurred in operating and maintaining the lines and business of G. & S. The additive clause beginning with the words '' and also '' clearly related only to operating expenses of the business. What else? To keep the lines and business clear from all incumbrances. How were those incumbrances to arise? From taxes, assessments, judgment liens or any act of W. U. upon or respecting the *lines and business of G. & S.* Finally, W. U. as a matter of adjective assurance, agreed to institute and maintain any proceedings necessary to protect and preserve what? The lines, business and franchises of G. & S.

By paragraph " Tenth " W. U. covenanted to make such reports " to public *municipal* or *state* authorities as may be required by law to be made by or on behalf " of G. & S.

Each and every provision of paragraph " Sixth " referred clearly to the property leased to W. U. This action seeks to write into the agreement the assumption and payment of Federal income taxes not upon the property leased or its operation but upon the rental paid by W. U. and received by G. & S. as lessor. The applicable law has been very recently stated in *Commissioner of Internal Revenue* v. *Western Union Telegraph Co.* (A. N. HAND, J., N. Y. L. J., June 17, 1944, p. 2333, col. 1, certiorari denied, May 29, 1944; 141 F. 2d, 774), as follows: " It has been settled by recent decisions that a corporation is taxable upon income constructively received by it when rentals due to it as lessor are paid directly to its stockholders. (*United States* v. *Joliet & Chicago RR.*, 315 U. S. 44). It is also settled that this rule is applicable in respect of rentals accruing upon stock of the lessor owned by the lessee (*Gold & Stock Tel. Co.* v. *Commissioner*, 83 F., 2d, 465, cert. denied 299 U. S. 564; *Pacific & Atlantic Tel. Co.* v. *Commissioner*, 83 F., 2d, 469, cert. denied 299 U. S. 564). We have heretofore held that taxes found to be due by the lessor under such circumstances, when it has no property with which to pay its income tax obligations, may be collected by means of an application by the government for an order enjoining the payment of the rental dividends to the lessor's stockholders until the collector shall have been able to satisfy the lessor's delinquent taxes therefrom (*United States* v. *Warren R. Co.*, 127 F., 2d, 134, C.C.A., 2; *United States* v. *Morris & Essex RR.*, 135 F., 2d, 711, C.C.A., 2)."

It is argued that the agreement in paragraph Sixth by W. U. to keep the properties leased clear " from all incumbrances arising from tax, assessment or judgment liens or from any act of the W. U. T. Co." indicates that Federal income taxes must have been intended because failure to pay the Federal income taxes by G. & S. results in liens upon the leased property under U. S. Internal Revenue Code, section 3670 (U. S. Code, tit. 26, § 3670). But that is not the fact and thus it is a complete *non sequitur* to say that since the lease provided that the lessee should keep the leased property free from judgment liens that the contracting parties must have had a lien such as is provided in section 3670 in

mind. No such lien is permitted or provided by section 3670. By the express language of section 3670 the lien falls upon the property and rights to property of the person neglecting and refusing to pay it. No lien, judgment or otherwise, may be imposed upon the property leased to W. U. during the 99 year term of the lease. Such a lien is imposed upon the reversionary interest of G. & S. Were it otherwise and the lessor could cause a lien to be imposed upon the property leased by reason of his own failure to pay income taxes upon the rental received by him, leases would be of little value.

We shall assume, however, despite the complete absence of testimony to support it, that the directors in 1881 did foresee the passage of a constitutional amendment and Federal income tax laws decades later. That assumption only weakens plaintiff's position. There can be no question but that parties may contract, if they wish, subject to legislative prohibition, that a lessee shall pay income taxes upon rental paid to the lessor. In this case it is clear that there was no such intention. If the parties had in mind that there had been income taxes in the American colonies, in the nation and in other States prior to 1881 and that there might be sometime during the term a Federal income tax, and then wrote into the contract provisions relating only to State and municipal taxes, *upon the property leased,* they clearly intended to *exclude* Federal income taxes on the rent money received by the lessor. If the parties had not in mind Federal income taxes, they, of course, did not intend to *include* in the lease a provision for the payment of them by the lessee. If they had in mind the payment of all taxes of whatever kind and description upon the leased property *and* upon the rental paid to the lessor and then wrote in provisions for the payment only of State and municipal taxes upon the *leased property* by the lessee, they quite evidently intended to *exclude* payment of Federal income taxes upon *rent* received by the lessee. There seem to be no other alternative intentions and under each of those, plaintiff's action fails. We cannot rewrite the contract.

Obviously the debt for unpaid income taxes on the rental received may be paid by G. & S. in the manner indicated in *United States* v. *Warren R. Co.,* 127 F. 2d 134, *supra,* and *United*

*States* v. *Morris & Essex R. Co.*, 135 F. 2d 711, *supra*, or, as was conceded by counsel for W. U. on the argument before us, by G. & S. requesting the payment to it, instead of to its stockholders, of the rent as it becomes due and then paying the income taxes therefrom. However, those are details which have nothing to do with the construction of an unambiguous contract.

Finally the matter is put beyond all doubt by our own case of *Brainard* v. *N. Y. C. R. R. Co.* (242 N. Y. 125). That was an action in which minority stockholders of Mahoning Coal Railroad Company brought a derivative action against N. Y. Central seeking to recover Federal income taxes assessed against the Mahoning Company for the year 1920. The action was predicated upon a lease entered into between the Mahoning Company and a predecessor of N. Y. Central whereby the predecessor company agreed: " That it [Lake Shore Company] will in due season pay *all* taxes and assessments which may be levied or become chargeable on the said road or property, *or upon the said Mahoning Company, by reason of its ownership thereof* " (pp. 129-130). Prior to the 1920 tax involved, N. Y. Central had been paying those taxes. This court reversed the judgments of the courts below in favor of plaintiff and dismissed the complaint. We held that prior payments by N. Y. Central did not change the clear contract provisions which did not contemplate that the predecessor of N. Y. Central would be liable for Federal income taxes assessed against the Mahoning Company. As will be noted, that case was much stronger for the plaintiff than is the instant one. We laid down there the applicable rule in this State as follows: " ' Unless the lease *expressly provides for the payment of taxes on the income* from rentals received under the lease, the imposition of such a burden on the lessee is not justified ' " (p. 132). Judge POUND said, further (p. 131): " In actions based on leases and working agreements like the one in question (which for convenience may be called a lease), where the lessee agrees to pay all taxes levied and assessed on or in respect to the property, the distinction between taxes on the income of property and taxes on the property itself has been repeatedly pointed out. With monotonous frequency the courts have held in this connection that a tax on the rents or income of real property is not considered a tax on the property itself. When the lessee is to pay all

taxes, ordinary and extraordinary which shall be imposed on the demised premises or ' in respect thereof,' the tax on rents is a tax not in relation to the property demised but in relation to the income thereof. (*Woodruff* v. *Oswego Starch Factory,* 177 N. Y. 23.) '' In the *Woodruff* case cited (1903) there was a covenant to pay, in addition to a yearly rent in cash: '' *All* taxes, charges and assessments, *ordinary* and *extraordinary,* which shall be taxed, charged, imposed or assessed on the hereby demised premises and privileges, or any part thereof, *or on the said parties of the first part,* their heirs and assigns in respect thereof '' (p. 26). As was said in *United States* v *Warren R. Co.* (127 F. 2d 134, C.C.A. 2, 1942): '' It has been universally held both by the courts of New York and other States that a covenant by a lessee to pay the income taxes of a lessor is not within the terms of the contracts unless the obligation is *clearly and directly specified* '' (p. 136). If there is to be a change in those rules which have been followed for so long, it should come from the Legislature.

It is unnecessary to discuss the other point raised as to the necessity of segregation of the proceeds of the sale of securities by W. U. since we are in accord with the courts below in their disposition of it.

The judgment should be affirmed, with costs.

LEHMAN, Ch. J., LOUGHRAN and RIPPEY, JJ., concur with DESMOND, J.; CONWAY, J., dissents in opinion in which LEWIS, J., concurs; THACHER, J., taking no part.

Judgments reversed, etc.