WESTERN UNION TELEGRAPH COMPANY, Plaintiff, *v.* PACIFIC AND ATLANTIC TELEGRAPH COMPANY et al., Defendants.

Supreme Court, Special Term, New York County, September 9, 1946.

**8**

*Clarence W. Roberts, John H. Waters* and *Francis R. Stark* for plaintiff.

*William Wendt* for Pacific and Atlantic Telegraph Company, defendant.

*M'Cready Sykes* for United States Trust Company of New York, as trustee for Sidney H. Solomon.

*Arthur Garfield Hays* and *Osmond K. Fraenkel* for Abraham & Co. and another, defendants.

*William W. Owens* for Cobb & Co., defendant.

*Alice Dillingham* for Anna Rochester, defendant.

*Norman C. Wynroth* for Isabelle Home, defendant.

*Philip Novick* and *Nat C. Hellman* for King & Co., defendant.

HECHT, J. In December, 1873, defendant Pacific and Atlantic Telegraph Company leased all of its telegraph lines to plaintiff, the Western Union Telegraph Company, for the term of 999 years from January 1, 1874. The rental stipulated was $80,000 per year, being 4% per annum on the lessor's capital stock of $2,000,000. It was further agreed that the lessee, in lieu of making payment to the lessor through its treasurer or other officer, should " pay the rental herein reserved to the several stockholders of the lessor ratably and in proportion to the number of shares of stock held by each stockholder respectively ".

Western Union owns 58,877 shares of the 80,000 outstanding shares of Pacific and Atlantic, the balance being held by numerous other stockholders. Some of them have been made parties defendant in this action as representative of all the minority stockholders, and an order heretofore signed by Mr. Justice O'Brien has determined that the questions involved are of common and general interest to all the stockholders, that it is impracticable to bring them all before the court, that those who have appeared would assure adequate representation of the class, and that the final judgment herein will be conclusive upon all the minority stockholders.

It has been authoritatively decided in connection with this very lease " that the rent reserved which under the agreement was payable directly by the lessee to the stockholders in proportion to their holdings, was income taxable against the lessor, not only so far as it was applicable to stock held by third parties, but also to stock held by the Western Union." (*Pacific & Atlantic Tel. Co.* v. *Commissioner of Int. Rev.*, 83 F. 2d 469, 470, certiorari denied 299 U. S. 564, holding expressly approved in *United States* v. *Joliet & Chicago R. Co.*, 315 U. S. 44). The question to be determined in this action is whether the Federal tax imposed on Pacific and Atlantic in respect of this income is, under the terms of the lease herein, the obligation of defendant lessor or of plaintiff lessee.

In *Van Rensselaer* v. *Dennison* (8 Barb. 23), the lessee covenanted to pay all taxes that might be thereafter assessed " to or upon the said thereby *granted premises* ", or upon the said lessor " *for and in respect of* the said premises " (p. 25) (italics in original). The Legislature subsequently imposed a tax upon rent. The court (Albany General Term) held that the lessee was not liable for this tax. Since the rents were not any part of the granted premises, the tax was not one on the " granted premises ". " It was not a tax ' for said premises;' that would mean the same as a tax ' on said premises,' and I do not see how it can properly be said to be a tax ' in respect of ' said premises, because it was on rent that issued out of said premises. The plaintiff [lessor] was not taxed for and in respect of said premises, but for and in respect of the rents reserved thereon." (Pp. 26–27). This decision was followed in *Woodruff* v. *Oswego Starch Factory* (177 N. Y. 23) where a similar tax on rents was held payable by the lessor, the lessee's covenant being to pay all taxes which shall be imposed " on the hereby demised premises " or upon the lessor " in respect thereof ".

In *Brainard* v. *New York Central R. R. Co.* (242 N. Y. 125) the Mahoning Company had entered into an operating agreement with a predecessor of the New York Central Railroad. The latter agreed to work, maintain and operate the road and property of the Mahoning Company, to pay Mahoning 40% of the gross earnings, and to pay all taxes which may be levied " on the said road or property, or upon the said Mahoning Company, by reason of its ownership thereof " (pp. 129–130). The court held that the obligation for income taxes fell on the Mahoning Company (the quasi lessor) rather than on the New York Central (the quasi lessee), saying, per Pound, J. (pp. 131–133):

" In actions based on leases and working agreements like the one in question (which for convenience may be called a lease), where the lessee agrees to pay all taxes levied and assessed on or in respect to the property, the distinction between taxes on the income of property and taxes on the property itself has been repeatedly pointed out. With monotonous frequency the courts have held in this connection that a tax on the rents or income of real property is not considered a tax on the property itself. When the lessee is to pay all taxes, ordinary and extraordinary which shall be imposed on the demised premises or ' in respect thereof,' the tax on rents is a tax not in relation to the property demised but in relation to the income thereof. (*Woodruff* v. *Oswego Starch Factory,* 177 N. Y. 23.) * * * What is meant by taxes assessed upon the Mahoning Company ' by reason of its ownership ' of the leased property? Do these words differ so essentially from the words ' on ' or ' for ' or ' in respect of ' leased premises as to call for another interpretation? * * * Doubtless the Mahoning Company would have no income tax to pay if it did not own the property but ownership taxes and income taxes have been so clearly separated that the rule has been recently formulated in these words: ' Unless the lease *expressly provides for the payment of taxes on the income* from rentals received under the lease, the imposition of such a burden on the lessee is not justified.' (*Ills. Cent. R. Co.* v. *Ind. Union Ry. Co.,* and cases cited, 6 Fed. Rep. [2d S.] 830, 837.) The rule has the merit of reasonableness and certainty and we do not hesitate to adopt it. If more is desired, the language may easily be made sufficiently comprehensive. * * * The distinction is pointed out in the *Woodruff* case (*supra*) (177 N. Y. at p. 29) where the court said: ' A tax upon rents may, doubtless, be regarded, in legal theory, as a tax upon the land; but, while as a general proposition that may be true, it has no influence upon the question here,' *i. e.,* the question of the liability of the lessee to pay the taxes on the rents. It follows that the language of the agreement is not sufficiently broad to cover taxes upon the payments to be made thereunder; that it is broad enough to cover the personal liability of the Mahoning Company for taxes on the tangible property; and that income taxes are not, in the legal significance of the words used, imposed upon the Mahoning Company ' by reason of ownership ' of the property." (Italics in original.)

In *Johnson* v. *Western Union Tel. Co.* (293 N. Y. 379) the court construed the lease of telegraph facilities to this same

plaintiff from Gold and Stock Telegraph Company as imposing the obligation for income taxes on the lessee rather than the lessor. This result contrary to that in the earlier cases, which were all explained and distinguished in the opinion, was based on two independent reasons, either of which alone would be sufficient (cf. *Matter of Broderick* v. *City of New York*, 295 N. Y. 363, 368-369.)

First, the lessee had covenanted (in paragraph sixth) to pay all taxes imposed upon the lessor's property by any State or municipal authorities, and to " keep the same [leased property] clear from all incumbrances arising from tax, assessment or judgment liens ". The court said, per DESMOND, J. (p. 384): " If State and municipal taxes alone had been under consideration, they would have been covered adequately by the express provision at the beginning of the Sixth paragraph, for the payment by the lessee, of such imposts. The later provision, in the same paragraph, as to keeping the property free from *all* tax or judgment liens must have been meant to be all-inclusive (see *Schlafly* v. *D'Arcy*, 1 F. 2d 297). Applicable here is the language of this court in a different situation: ' these words are sufficient to cover, and must have been intended to cover, all possible forms of taxation ' (*Ward* v. *Union Trust Co.*, 224 N. Y. 73, 79, quoting from *Walker* v. *Whittemore*, 112 Mass. 187)." (Italics in original.)

The lease in this case contains no covenant similar to the foregoing, so that this basis of the *Johnson* decision (*supra*) cannot be applied here. It is necessary, therefore, to consider the other basis of that decision (293 N. Y. 379, 386): " Our close examination of the particular language of this instrument does not mean that we are picking out words or phrases from a whole text. The very same result is reached when we seek out the general plan of the contract." This " general plan of the contract " was thus described (pp. 382-383, 386): " The scheme of the lease, as further described in subsequent paragraphs hereof, left the lessor with no property of any sort in its possession, no income except the agreed rental, and no actual money receipts from any source, since the rental installments were to go, for the whole ninety-nine years, direct to lessor's stockholders. It is plain beyond controversy that the intent was that the lessor corporation, thus left without any funds, property or actual income, was to have all its obligations, of every sort, discharged during the term of the lease, by defendant as lessee. * * * Prior to the leasing, Gold and Stock Telegraph Com-

pany had carried on a ' telegraph ticker service '. The lease here under scrutiny went beyond a mere letting of the physical properties theretofore used in that enterprise. The indenture listed, also, as leased assets, ' the telegraph lines and business ' of the lessor. Defendant was to have for itself all the revenue thereof. It agreed, at its own cost and expense, thereafter to ' operate the said lines and appurtenant facilities for business ' and to keep them in condition suitable for the transaction of the kind of business theretofore conducted by the lessor. Besides the rental provisions above alluded to, and covenants to which we shall refer hereafter, for keeping the property clear of taxes, incumbrances and liens, defendant promised in the lease to assume and pay ' all costs and expenses incurred in the operation and maintenance of the lines and business of the G. & S. T. Co. * * * '. It was a complete, functioning business enterprise that was leased. At the end of the term, lessor was to have its properties back not only intact and in good condition, but 'as free from * * * encumbrance thereon as they were, when received '. In so many words, defendant covenanted to keep the whole property and business of Gold and Stock Telegraph Company ' clear from all incumbrances arising from tax, assessment or judgment liens '. * * * That plan contemplated the turning over free and clear of liens, to the lessee, of all lessor's property *and its return in the same condition.* It contemplated the constructive payment of the rent to the lessor but actual payment thereof in undiminished amount to lessor's stockholders, with an absolute guarantee thereof running from the lessee to the stockholders, and, finally, a stripping from the lessor of all funds, principal or income, and the assumption by the lessee of responsibility for all costs and expenses which ordinarily would be charged to the lessor and for the removal from the property of every tax or other lien and incumbrance. To say that such a scheme left the matter of possible income taxes suspended in the air till the long distant day of the lease's end, is to accuse the parties of folly." (Italics supplied.)

In my opinion, this reasoning covers the case at bar. Here, too, the scheme of the lease " left the lessor with no property of any sort in its possession, no income except the agreed rental, and no actual money receipts from any source ". Here, too, " It was a complete functioning business enterprise that was leased ", and the lessee had the right to work said lines and property at its own expense and to enjoy the profits thereof (paragraph third of the lease).

The lessor herein agreed (paragraph eleventh) that it "shall assume, pay and discharge all lawful claims, debts and liabilities of whatsoever nature arising by or accruing against said party" prior to the first Tuesday of May, 1874, "whether the same be due or may hereafter become due" and that said party "shall apply forthwith all moneys belonging to it to the liquidation of said indebtedness at maturity." The lessee "agrees at the expiration of the term herein created to deliver the lines and property hereby leased to the lessor in as good condition as they are now, natural decay and ordinary wear and tear excepted" (paragraph eighteenth). I do not read the exception that "natural decay and ordinary wear and tear" as restricting the word "condition" to physical condition.

When the lessee received the lines and property from the lessor on January 1, 1874, they were free from liens of any kind, or at least would be so freed by the lessor within five months thereafter. As of June 1, 1946, the unpaid income taxes and interest thereon which had been assessed against Pacific and Atlantic by the Federal Government, aggregated $432,171.08. So long as these remain unpaid they result in liens on the leased property (*Johnson* v. *Western Union Tel. Co., supra,* p. 383). These liens would of course be increased by the amount of income taxes assessed during the remaining 923 years of the lease.

It is clear that so long as the lessee permits these liens to remain on and accrue against the property which it received free of any liens, the lessee violates its explicit covenant "at the expiration of the term herein created to deliver the lines and property hereby leased to the lessor in as good condition as they are now".

The Gold and Stock lease contained an even stronger covenant in this respect, the lessee there agreeing (paragraph fifth) that upon any restoration of the said lines and other property to the lessor, "the same shall be in as good condition for the purposes of the business heretofore carried on by the lessor and as free from bonded debt or other incumbrances thereon as they were when received by the lessee under this agreement subject only to such alterations and modifications in the natural evolution of the said business thereof as may be deemed expedient and necessary." It is true that in Judge DESMOND's opinion the emphasis is placed not on this covenant but rather on the lessee's specific covenant in paragraph sixth to keep the leased premises free from all tax incumbrances. In dis-

tinguishing the earlier cases the court said (pp. 384–386): " We are mindful of the general rule that a lessor must ordinarily pay his own income taxes on his rents. We have not overlooked the long line of cases rejecting demands of lessors for payment of such taxes by their lessees. But those were cases where the taxes which the lessee promised to pay were in one way or another specified in the lease, in terms which excluded the idea of income taxes. (See, for instance, *Boston & Providence R. R.* v. *Old Colony R. R.*, 269 Mass. 190; *Stony Brook R. R.* v. *Boston & Maine R. R.*, 260 Mass. 379; *Catawissa R. R. Co.* v. *Phila. & R. Ry. Co.*, 255 Penn. St. 269; *Sharon Railway Co.* v. *Erie R. R. Co.*, 268 Penn. St. 396; *Woodruff* v. *Oswego Starch Factory*, 177 N. Y. 23.) All of the decisions just above cited turn on limiting language in the leases themselves. In each of those cases the lessee's promise was not to pay all taxes or to remove all tax incumbrances but only to pay taxes specified. * * * Defendant cites *Brainard* v. *N. Y. C. R. R. Co. (supra)*, as holding that, to impose on a lessee liability for his lessor's income taxes, the lease itself must refer to ' income taxes ', in so many words. The *Brainard* decision goes to no such extreme. Under construction in that lawsuit was a contract of lease (or management) quite unlike the one we are construing here. The lessee in the *Brainard* case had covenanted to pay all taxes ' on the said road or property, or upon the said Mahoning Company [the lessor], by reason of its ownership thereof '. (p. 129–130.) This court held that the quoted language described only property taxes, not income taxes. There was in that lease no general, all-inclusive promise to take care of all tax liens. This court in the *Brainard* case did ' adopt ' from a Federal decision the rule that imposition on a lessee of a lessor's income taxes is not justified ' unless the lease expressly provides for the payment of taxes on the income from rentals received under the lease '. (p. 132.) But the *Brainard* opinion does not say or mean that the income tax had to be mentioned by name. The holding of the case is that words which are commonly used only to describe property taxes cannot fairly be construed to include income taxes."

Although the court twice refers to the all-inclusive promise to take care of all tax liens, this portion of the opinion is followed by the statement already quoted (p. 386): " Our close examination of the particular language of this instrument does not mean that we are picking out words or phrases from a whole text. *The very same result is reached when we seek out*

*the general plan of the contract. That plan contemplated the
turning over free and clear of liens, to the lessee, of all lessor's
property and its return in the same condition."* (Italics
supplied.)

Analysis of the entire opinion of the *Johnson* case (*supra*)
satisfies me that it requires the conclusion that the lessee's
covenant to deliver the lines to the lessor " in as good condition
as they are now " is effective to impose upon the lessee the
liability for income taxes assessed against the lessor in respect
of the rental paid by the former to the latter's stockholders,
even in the absence of a specific covenant by the lessee to keep
the leased premises free from all tax incumbrances.

This income tax in respect of the rental paid is likewise tax-
able to the lessor and the tax thereon must be paid by the
lessee (*United States* v. *Joliet & Chicago R. Co.*, 315 U. S. 44, 49,
*supra; United States* v. *Boston & Maine R. Co.*, 279 U. S. 732,
734–736). Plaintiff argues that this process will be repeated
ad infinitum and would result in an annual tax of $133,333.33
on the annual income of $80,000. This absurd result is not
indicated by anything said in the two cited cases which hold
taxable only the first payment of income tax, i.e., that which is
payable in respect of the rent.

Plaintiff has heretofore paid income taxes and interest
thereon aggregating $121,543.39 under an agreement with
defendant that these payments would be treated as an advance
from the former to the latter. Since the covenant in the lease
clearly imposes liability for these payments on the lessee this
loan agreement cannot be treated as a practical construction
of the parties leaning to a contrary result (*Johnson* v. *Western
Union Tel. Co.*, 293 N. Y. 379, 387, *supra; Brainard* v. *New
York Central R. R. Co.*, 242 N. Y. 125, 133–134, *supra*). In any
event, this could not be accepted as a construction by the parties
because at the time the directors of defendant were all directors
or officers of plaintiff.

Since plaintiff was required to pay these income taxes, the
payments which it made were in discharge of its own obligation
and cannot be treated as an advance to defendant. The loan
agreement must be cancelled, as was decided in the subsequent
trial of *Johnson* v. *Western Union Tel. Co.* (184 Misc. 728).

Judgment will be granted (1) declaring that plaintiff is
liable for all Federal income taxes (with interest and penalties
thereon) which have been or may be assessed during the period
of this lease in respect of the rental payment by plaintiff to

defendant's stockholders, together with the income tax assessed on the amount of such taxes paid; (2) directing plaintiff to pay all income taxes (with interest and penalties thereon) now due and unpaid, and to pay all income taxes which may be assessed during the term of the lease; (3) canceling the loan agreement and directing the refund to defendant of all interest paid thereon.

Settle judgment in accordance with the foregoing.