NORTHWESTERN TELEGRAPH COMPANY et al., Plaintiffs, *v.* WESTERN UNION TELEGRAPH COMPANY, Defendant.

Supreme Court, Special Term, New York County, January 6, 1949.

*Ganson J. Baldwin* for plaintiffs.

*Francis R. Stark, Clarence W. Roberts* and *John H. Waters* for defendant.

HOFSTADTER, J. In this action there is presented again the vexed question whether the Western Union Telegraph Company (referred to throughout as Western Union), as lessee under a long term lease by which it absorbed into its system the telegraph lines and business of another telegraph company, in this instance Northwestern Telegraph Company (referred to as Northwestern in this opinion), is liable for United States income taxes imposed on the lessor in respect of the rental paid by Western Union directly to the stockholders of Northwestern.

Northwestern owned and operated telegraph lines in various western States and territories and in the Dominion of Canada, which formed a complete, functioning telegraph business enterprise. By agreement dated May 7, 1881, it turned over this business to Western Union for ninety-nine years from July 1, 1881. On taking possession Western Union was to operate the same as part of its general telegraph system, to maintain it " in as good condition for business &ast; &ast; &ast; " as when received and to make such improvements and additions " as may be necessary to keep the same in as good condition for business and with as large facilities &ast; &ast; &ast; " as any system of equal extent doing an equal amount of business. (Arts. 1st, 2d.)

Northwestern at the time had outstanding a bonded indebtedness of $1,180,000, secured by first mortgage on its property. The bonds bore interest at 7% and provided " principal and interest coupons to be paid free of United States taxes ". Northwestern warranted that the telegraph property turned

over was free of all incumbrances, excepting the foregoing $1,180,000 mortgage and agreements with railroad and rail- way companies and others enumerated in annexed schedules (art. 6th). Western Union assumed payment of interest on the mortgage bonds or any bonds thereafter issued in exchange or extension thereof (art. 2d).

Western Union undertook to perform the outstanding agreements with railroads and others and to indemnify Northwestern against them (art. 5th). Western Union further agreed to save Northwestern harmless from '' all or any losses or damage arising or accruing * * * by the use or occupation of the lines and property * * * or any act or default of said second party (Western Union) in relation thereto '' (art. 6th).

Northwestern agreed not to engage in the telegraph business or to build, own or hold telegraph lines by lease or otherwise during the continuance of the agreement (art. 8th). Western Union covenanted on the expiration, or sooner termination of the agreement, to deliver the property to Northwestern '' in as good condition for business '' as when received by it (art. 9th). Northwestern also bound itself to maintain its corporate existence during the term of the agreement by holding meetings, electing officers and generally doing all things necessary for that purpose (art. 12th). To defray the necessary expenses of so maintaining Northwestern's organization, Western Union agreed to pay Northwestern's president $2,500 a year for fourteen years (art. 2d, II).

Western Union was to receive all the earnings and revenues of the property and generally to manage the same as it might determine to be for its best interest (art. 1st).

This is the basic structure of the agreement of which the clauses bearing immediately on the question to be decided form a part. By these clauses Western Union agreed to pay semi-annually, commencing January 1, 1882, from $100,000 to $150,000 a year. These payments were to be increased pro rata annually, until the payment for the year ending July 1, 1896, reached $150,000. From July 1, 1896, until the expiration of 99 years from July 1, 1881, the annual payment was to be $150,000 (art. 2d, II). Since payments at the rate of $150,000 a year have admittedly been made since July 1, 1896, it will be simpler to disregard the earlier payments of lesser amounts and in the further discussion to treat this provision as though it required the constant payment of $150,000 annually.

It was further agreed that Northwestern's capital stock was to be fixed at $2,500,000, divided into 50,000 shares of $50 each,

and that " the payment of the sums hereinbefore provided for shall be made directly to the Stockholders \* \* \* at the rate of six (6) per cent. per annum during the term of this contract ". Then follows this important obligation assumed by Western Union: " That whenever and as often as requested by the owner and holder of any of said stock, said second party will endorse on the certificates, an agreement to be executed in its behalf by its proper officer, to pay such proportion of such annual sum agreed to be paid under the provisions of the 2nd subdivision of Article 2nd hereof, to be paid during the continuance of this agreement in the manner herein provided as belongs to the amount of stock contained in such certificate; all such payments to be so far a discharge of the obligations assumed by this agreement."

By agreement reached about the time the lease was made all Northwestern's stock certificates issued since the making of the lease have borne a legend and indorsement in effectuation of the foregoing provision. At the top of each certificate the following appears: " DIVIDENDS GUARANTEED BY THE WESTERN UNION TELEGRAPH Co.".

The body of each certificate contains the statement: " This stock is entitled to dividends under the provisions of a certain contract with the Western Union Telegraph Company, taking effect, July 1st. A. D. 1881, and running ninety nine years. Dividends are payable semi-annually at the office of said Western Union Telegraph Company, in the City of New York, \* \* \* six per cent in equal amounts on the first days of January and July in each year for ninety nine years from the first day of July, A. D. 1881. All such payments guaranteed by the Western Union Telegraph Company as by the endorsement hereon."

Each certificate is countersigned on its face by Western Union. The reverse side of the certificate bears the indorsement: " In accordance with the provisions of the contract within named, the Western Union Telegraph Company will pay to the owner and holder of the within certificate, the several dividends therein described, at the time and place therein stated, during the period that said contract shall continue in force. (seal) ' WESTERN UNION TELEGRAPH Co.' ".

In July, 1881, pursuant to prior understanding between them, Northwestern, with the co-operation and approval of Western Union, applied to the New York Stock Exchange for the listing of its stock and bonds. This application stated that Northwestern was then operated by Western Union under a lease

for 99 years, by the terms of which Western Union " guarantees the payment of dividends on the stock as follows:   *   *   * ".  The application was granted and the stock has since been bought by the public in reliance on the agreements by Western Union.

The agreement imposes on Western Union liability for the payment of taxes by this clause: " III. Said second party will pay all taxes, assessed or levied upon said property or any part thereof by any State or Municipal Authority during the continuance hereof, and keep such property free and clear from all liens or incumbrances, by reason of such taxes." (Art. 2d, III.)

When the United States income tax law first became effective in 1913, it was not clear whether the rent paid directly to the lessor's stockholders under a lease such as the one before us was income taxable to the lessor. However, in 1917, or 1918, the Treasury Department issued regulations pronouncing such rent taxable income of the lessor. Counsel for Northwestern and Western Union were of the opinion that the imposition of income tax was unwarranted and the efforts of the United States to enforce the tax liability were resisted. The Government, however, prevailed in a suit decided in 1936, by the United States Circuit Court of Appeals for the Second Circuit (*U. S.* v. *Northwestern Telegraph Co.*, 83 F. 2d 468, certiorari denied 299 U. S. 565). The United States did not enter judgment for the taxes so held due until October, 1943. Judgments against Northwestern for income taxes for the years 1927–1941, in the aggregate amount of $522,686.23, have been recovered. Taxes for later years not yet reduced to judgment have accrued, and these taxes and the judgments already entered, if unpaid for the remaining term of the lease will, with interest, amount to about $2,440,000, almost equal to the entire par value of Northwestern's capital stock. If, moreover, the present tax rate continues until the end of the term, additional taxes with interest, totaling about $4,300,000 more, will accrue, so that Northwestern may, at the expiration of the lease, face a possible income tax liability of over $6,808,000. Northwestern has no actual income or assets out of which these taxes can be paid.

Contrary to the view held by counsel for Western Union, that Northwestern's stockholders were not liable as transferees for these income taxes — a view sustained by decision of the Circuit Court of Appeals in cases involving stockholders of other corporations whose property had been leased to Western Union — the Circuit Court of Appeals in 1944 overruled these earlier decisions and held the stockholders of telegraph com-

panies so leased liable as transferees (*Commissioner of Internal Revenue* v. *Western Union Tel. Co.*, 141 F. 2d 774, certiorari denied 322 U. S. 751). Since 1945, the United States has been endeavoring to collect the taxes from the Northwestern's stockholders as transferees and has claimed the entire amount received by each stockholder during the tax years, with interest, and not merely a pro rata share of the tax assessed. The position so asserted by the Government has been upheld in a test suit brought and prosecuted by one of the plaintiffs in this action with Western Union's co-operation (*Travelers Ins. Co.* v. *Commissioner of Internal Revenue*, 161 F. 2d 93, certiorari denied 332 U. S. 766).

This action was begun in 1945, by Northwestern and some of its stockholders, on behalf of themselves and all other stockholders similarly situated, for a declaratory judgment determining Western Union obligated to pay Northwestern's income taxes. The parties have entered into a formal stipulation of facts and the pleadings are deemed amended to conform to the facts. After the plaintiffs had moved before me at Special Term, Part III, for judgment upon the agreed facts, to remove any doubt as to the propriety, as a matter of practice, of finally disposing of the action by motion rather than by trial, I made an order placing the action on the Special Term calendar for trial and set it for trial before me at Special Term, Part IV. The case thus has regularly come on for trial and the facts recited are embodied in the stipulation of facts and supporting exhibits received in evidence on the trial.

Two recent decisions of the Court of Appeals, determining the liability of Western Union for the lessor's income taxes under similar leases, obviate the need for as extended a discussion as the case might otherwise demand. In *Johnson* v. *Western Union Tel. Co.* (293 N. Y. 379) it was held that, in the context of the lease there construed, a provision to keep the leased property " clear from all incumbrances arising from tax, assessment or judgment liens * * * " imposed on Western Union liability for the income taxes of the lessor, Gold and Stock Telegraph Company. In the second case, involving leases by three telegraph companies, Pacific and Atlantic, Southern and Atlantic, and Empire and Bay States, in which the lower courts had, on the authority of the *Johnson* case (*supra*) held Western Union liable, the Court of Appeals reversed and reached a contrary result (*Western Union Tel. Co.* v. *Pacific & Atlantic Tel. Co.*, 297 N. Y. 124). I must determine whether this case

is ruled by the *Johnson* or the *Pacific, Southern* and *Empire* decision. In the interest of brevity, I shall refer to the last mentioned case as the *Pacific* case.

The general rule is that a covenant by a lessee to pay all taxes imposed on or in respect of leased property does not require the payment of income taxes (*Brainard* v. *N. Y. C. R. R. Co.*, 242 N. Y. 125). In holding that this general rule did not govern the tax clause there passed on, the majority opinion in the *Johnson* case said that its conclusion accorded with the general plan of the contract (p. 388). The defendants in the later *Pacific* case leaned heavily on this added reason given by the court in the *Johnson* case. But in the *Pacific* case (*supra*) the court enlarged on its reference in the *Johnson* opinion to the general plan. The court said (p. 133):

" So, reasoned Special Term, while there is no ' Johnson case ' tax lien covenant in the three cases now before us, the ' general plan ' of these three grants is the same as the ' general plan ' of the *Johnson* contract, and the result therefore must be the same.

" That was not the meaning of our opinion in *Johnson* v. *Western Union Tel. Co.* (*supra*). The majority opinion in that case grounded the income tax liability flatly on the clauses as to tax liens. We looked at and wrote about the ' general plan of the contract ' in the *Johnson* case only to show that the plain meaning of the tax clauses therein was not altered or affected by anything in the lease's ' general plan '. The *Brainard* case's holding (*supra*), not overruled but reaffirmed in the *Johnson* case, was that such lessors must pay their own income taxes unless there be found forthright language whereby the lessee assumes that obligation. Such language was in the *Johnson* case lease. It is not in any of the three leases now before us."

This explicit statement of what the court meant when it spoke of the general plan of the agreement in the *Johnson* case gains added weight from the circumstance that the same judge wrote both the *Johnson* and the *Pacific* opinions. It should be noted, too, that while the *Johnson* case was decided by a divided court, in the *Pacific* case the court was unanimous and two of the judges who voted with the majority in the *Johnson* case joined with the other members of the court in the *Pacific* case in holding Western Union not liable for the income taxes. I, therefore, conclude that if liability is to be fastened on Western Union in this case the liability must be found in " forthright language " imposing it.

I do not find such language in the agreement. Certainly it is not to be found in the quoted provision to keep the property

free from " all liens or incumbrances, by reason of such taxes."
" Such " taxes are the taxes which Western Union in that very
clause had undertaken to pay — taxes " upon said property or
any part thereof ", not income taxes. The *Johnson* opinion dis-
tinctly recognized that the agreement to pay taxes on the prop-
erty, standing alone, was not enough to charge Western Union
with liability for income taxes (293 N. Y. 379, 384). The agree-
ment to keep the property free of liens for taxes on property,
which is all we have here, is far different from the agreement
in the *Johnson* case to keep it " clear from all incumbrances aris-
ing from tax, assessment or judgment liens   \*   \*   \*." The
clause, if anything, is narrower than the one in the Pacific and
Atlantic lease by which Western Union undertook to make pay-
ment " without any deduction or abatement for or on account
of taxes or assessments or for any other purpose whatsoever
\*   \*   \*."

The plaintiffs have earnestly sought to read into various
clauses of the agreement between Northwestern and Western
Union, enough to support an assumption by Western Union of
liability for the income taxes. No useful purpose is served by
discussing in detail the many ingenious contentions put forward
by the plaintiffs to establish their thesis. I have considered
them all but find them insufficient to overcome the holding in the
*Pacific* case. It is true that the agreements in the *Pacific* case
are not entirely the same as the agreement in this case. This is
necessarily so for there were differences in the situations and
in the transactions themselves which required differences in
some of the provisions. As might be expected the language
varies also. Yet, making allowance for these differences, in
essence, the underlying plan embodied in the agreements in the
*Johnson*, the *Pacific* and in this case is the same. In each instance
a going telegraph business was turned over to Western Union
under a long-term lease, and Western Union agreed to pay
directly to the lessor's stockholders a rental equal to a fixed
percent of the par value of their stock; the lessor agreed not to
engage in the telegraph business during the term of the lease
but to maintain its corporate organization. For all practical
purposes, the lessor was stripped of all property and income and
ceased to function as a business enterprise. The clauses prin-
cipally invoked by the plaintiffs appear, though in varying
form, in the *Pacific* case agreements and many of the arguments
pressed on the court here were also made in the *Pacific* case. I
am, however, unable to find in the text of the agreement before

me any clear indication of a purpose to cast on Western Union the burden of Northwestern's income tax. In its absence I am constrained by the authority of the *Pacific* case to reject the plaintiffs' contention.

There is, it is true, one feature in this case which was not present in either the *Johnson* or the *Pacific* cases — the guarantee of dividends. The plaintiffs argue with much force, that the guarantee of dividends emblazoned on the stock certificates and relied on by the public in buying the stock should conclude Western Union. Had the agreement between Northwestern and Western Union used the term " dividend " the plaintiffs' might well be sustained. But it does not. Nor does the legend on the face or the guarantee on the reverse side of the certificates limit itself to the use of this term. In each instance specific reference is made to the contract between Northwestern and Western Union, so that Western Union's obligation is in reality no other than that assumed by it in the contract. In the circumstances the term becomes a synonym for distribution or payment and, as a statement of Western Union's duty, is a misnomer. The misuse of the word, however occasioned, cannot enlarge Western Union's obligation under the agreement to which the holder of the certificate is referred. The agreement, not the certificate, is the source of the undertaking.

What was said in the *Pacific* case regarding a similar indorsement on the Empire and Bay States stock certificates by which Western Union guaranteed " the quarterly payment of one per cent upon the par value of the Stock  *  *  *  subject to the conditions and provisions of the lease  *  *  * " is applicable here: " Nor are the defendants in the *Empire and Bay States* case helped by the fact that Western Union agreed to, and did, indorse on each *Empire and Bay States* stock certificate a guarantee of the quarterly payment of 1% on the par value of the stock ' subject to the terms and provisions of the lease '." (297 N. Y. 124, 133.)

I have not overlooked *New York Central R. R. Co.* v. *New York & Harlem R. R. Co.* (185 Misc. 420, affd. 272 App. Div. 870, affd. 297 N. Y. 820) decided by the Court of Appeals since the *Pacific* case. There the Court of Appeals affirmed a determination that the lessee of a railroad was liable for the lessor's income taxes. Aside from the difference in the language of the critical clauses, there was a long history of practical construction by the lessee. There is no reason to assume that the Court of Appeals in disposing of this case without opinion, so soon

after the *Pacific* case, was departing from the principle announced in the *Pacific* case.

In reaching the foregoing result I have followed what I regard as the controlling precedent of the *Pacific* case. As I read the opinion in that case it is decisive of the problem posed here. Being thus bound I have not ventured to explore the matter independently.

I find no merit in the contention of either the plaintiffs or the defendant that the other party adopted a practical construction of the agreement other than that expressed in its language. Assuming, for the sake of argument, the applicability of the rule of practical construction to the present agreement, there is not sufficient evidence of such construction upon which any conclusion can safely be based.

I likewise find that the defense of laches has not been established. There is no proof of prejudice to the defendant, in the absence of which the defense of laches fails. (*Marcus* v. *Village of Mamaroneck*, 283 N. Y. 325, 332; *Boardman* v. *Lake Shore & Mich. So. Ry. Co.*, 84 N. Y. 157, 182–184.) But, aside from this, it is clear to me that there has been no undue delay in bringing the present action. For years the tax questions were the subject of extended litigation in which the parties found it to their mutual advantage to co-operate. Apparently they considered it sounder strategy to present a united rather than a divided front. Both Northwestern and Western Union seem to have been perfectly content to postpone the judicial determination of the present controversy in the hope that it would never be of practical moment. When the Circuit Court of Appeals reversed itself and upheld the Government's right to reach the stockholders as transferees the danger, which had appeared dim, became real and imminent. The plaintiffs moved promptly after the situation thus became acute. Western Union was, of course, free to institute an action for a declaratory judgment at any time as it did in the *Pacific* case. Under all the circumstances, I am convinced that the plaintiffs were justified in not precipitating the controversy before they did and that they are not chargeable with laches.

The defendant is accordingly entitled to judgment declaring that it is not liable for the payment of any of Northwestern's income taxes, but the judgment will be without costs.

The foregoing constitutes the decision in the case. Settle judgment in accordance herewith.