## THOMAS *v.* THOMAS
[No. 85, October Term, 1951.]

*Decided February 8, 1952.*

**232**

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Parsons Newman,* with whom were *Richard E. Zimmerman* and *John L. Clark* on the brief, for the appellant.

*William H. Storm* and *W. Clinton McSherry,* with whom were *C. Ferdinand Sybert* and *James McSherry* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

This is a suit by one brother against another to compel repayment of part of the former's income taxes, under an indemnity or assumption agreement entered into at the dissolution of a partnership between them. It was tried before Judge Clark, sitting in the Circuit Court for Howard County, without a jury, and, at the conclusion of the case, a judgment was entered for the defendant for costs, whereupon the plaintiff appealed.

It appears from the record that the plaintiff, the defendant, and a third brother, Lee Thomas, were partners in a business conducted in the firm name of Three Springs Fisheries. Leicester Thomas, Jr., son of the defendant, was the manager, and the business of the partnership was the raising and selling of goldfish, water lilies, etc. The place of business was Lily Pons, Frederick County, Maryland. On January 10, 1936, another business was started, to deal in feeds, grains, seeds, and fertilizers. It was called Thomas Supply Company, and had its office in the office of the Three Springs Fisheries. Leicester, Jr., was the manager. He contends that he was the sole proprietor, but the plaintiff, Clarence, claims that this was always a partnership, consisting of himself, Leicester, Lee, and Leicester, Jr. Three Springs Fisheries made regular partnership income tax returns, but no partnership returns were made for Thomas Supply Company until 1945. It was claimed by Leicester, Jr., that he included the income of that business for the preceding years in his personal returns.

Lee Thomas died about 1940. His widow and administratrix claimed a share in the business of Thomas Supply Company, and in this she was supported by Clarence, but her contention was denied by Leicester and Leicester, Jr. The relations within the family became strained. Clarence disapproved of Leicester, Jr.'s management, and of certain things he was claimed to have been doing. Mrs. Lee Thomas finally dropped out of the picture on Clarence's advice, according to his testimony. There was testimony that she relinquished any claim on the assets of the Thomas Supply Company, and Leicester and Leicester, Jr., assumed all the liabilities and agreed to save her harmless from any claim that might be brought against her, growing out of the business of Three Springs Fisheries.

On October 19, 1944, as a sort of settlement between the three remaining parties, Clarence, Leicester, and Leicester, Jr., it was agreed that the profits of the Supply Company to that date had amounted to $39,000. One third thereof, $13,000, was immediately set up on the company's books as a credit to each, and three Supply Company checks for $5,000 each were drawn, charged against said credits, and delivered to the parties. Clarence deposited his in his own account. Leicester and Leicester, Jr., say the credit of $13,000 to Clarence was a gift made to keep peace, but Clarence insists that he had always been a partner, and that these credits were a belated distribution of the partnership profits. He did not, however, include the $13,000, or any part thereof, in his income tax returns for 1944, and neither did Leicester. Finally, in November, 1947, the difficulties between the parties culminated in an agreement whereby Leicester was to buy out Clarence's interest in Three Springs Fisheries for $55,000, and Leicester and Liecester, Jr., were to buy out his interest in the Supply Company for $11,820. The agreement for the Three Springs Fisheries transaction was copied by a typist from an agreement which had been prepared by counsel when Mrs. Lee Thomas sold out her interest, and it

was executed by Clarence and Leicester. Although it was the smaller concern, when the question of the agreement respecting the Supply Company came up, Clarence had his counsel draw up a contract. This contract recited the fact that he, Leicester and Leicester, Jr., had been partners, that differences had arisen, and then, after providing that the partnership was dissolved by mutual consent, the agreement recited that Clarence sold his interest to Leicester and Leicester, Jr., for $11,280 (a transposition of figures corrected at the settlement), and the third paragraph provided: "That the said G. Leicester Thomas, Sr., and George Leicester Thomas, Jr., jointly and severally, for themselves, their heirs and personal representatives, do hereby covenant and agree with the said Clarence C. C. Thomas to assume and pay all liabilities of the said partnership heretofore incurred and unpaid as of the date of these presents, and the said G. Leicester Thomas, Sr., and George Leicester Thoms, Jr., for themselves, their heirs or personal representatives, do hereby further covenant and agree with the said Clarence C. C. Thomas to save the said Clarence C. C. Thomas harmless from and any all claim or claims which may or might be brought against him arising or growing out of the business of the said partnership." When this contract was submitted by Clarence, Leicester filled in the blank space left for the date, and signed it. Leicester, Jr., failed to sign, but in the end, Leicester gave Clarence his personal check for $11,820, and Clarence stepped out of the partnership. We have, therefore, a contract drawn for execution by two purchasers which is signed by only one, and one of the contentions made in this case is that it was really not a valid contract for that and other reasons.

The Internal Revenue Department made an audit in 1947 of Clarence's 1944 income tax returns and assessed an additional tax of $862.22 against him. He paid this. At that time, the distribution of the $39,000 made by the Supply Company in October, 1944, had not been brought to the Government's attention. Subsequently,

however, it was discovered, and the income tax authorities re-opened Clarence's income taxes for that year, as well as those of Leicester. It may be presumed that the contention that the $13,000 to Clarence was a gift was either not presented to the Government, or was rejected by it, because it was ruled by the Treasury Department that the $13,000 was income, on which Clarence was liable for the tax. The same ruling was made as to Leicester. Clarence and Leicester each discussed the matter with their tax consultants at a joint meeting, according to Leicester, in the office of Haskins and Sells, accountants, in Baltimore. On the advice of these accountants, both of them paid their assessments, and were apparently advised not to file claims for refunds. The amount of the 1944 deficiency in Clarence's income tax was calculated at $6,526.84, to which was added $1,476.04 interest and $326.34 penalties, making a total of $8,329.22. A credit was allowed for overpayments in 1947 of $2,009.10, but this does not affect the amount due by Clarence for 1944 taxes. Clarence now claims that under the agreement signed by Leicester, this is a claim "arising or growing out of the business of Thomas Supply Company", and, therefore, Leicester should reimburse him.

We may assume without deciding, as did the trial judge, that the agreement is a valid and binding contract made by Leicester. The trial judge held, upon this assumption, that it did not cover the reimbursement of the taxes, and his decision was based upon that question alone. If we agree that his decision on this point was correct, that ends the case, and there is no occasion to discuss the other question.

It is earnestly contended by the appellant that Clarence was fearful of difficulties which would arise as a result of the management of the business by Leicester, Jr., and he was particularly anxious to be protected against any claim that might be made on that account. He refers to the well known rule that in the determination whether any uncertainty or ambiguity exists, or de-

termining what the real agreement is, the court, in ascertaining the intention of the parties, considers their situation, the subject matter of the contract, surrounding circumstances, and the object to be accomplished. *National Union Mortgage Corporation v. Potomac Consolidated Debenture Corporation,* 178 Md. 658, 673, 16 A. 2d 866. *Baltimore Butchers Abattoir Live Stock Co. v. Union Rendering Co.,* 179 Md. 117, 122, 17 A. 2d 130. He also refers to an annotation in 4 A. L. R. 2d 1314, headed "Tax liabilities as within agreement for assumption or payment of another's obligations", and states correctly that the cases there mentioned hold that taxes are obligations. All of this may be admitted, but it seems beside the point. The obligations from which Leicester agreed to save Clarence harmless were obligations arising or growing out of the partnership. Had these taxes been due by the partnership, they would undoubtedly have been within the wording of the agreement. They were not, however, obligations of the partnership, they were obligations of an individual. In other words, they were not income taxes due by the partnership, but were income taxes due by Clarence.

The appellant, however, says that while this is true, and, while it is not contended that these taxes were debts of the partnership, they arose or grew out of the business of the partnership, and therefore are included in the indemnity agreement. He supplements this by saying that it was due to the conduct of the business and the way it was conducted by Leicester, Jr., that no profits were distributed prior to 1944, and that had profits been properly distributed or accounted for prior to that year, taxes would have been paid on them, and the obligation would not have arisen.

If we look at this contention in the light of circumstances surrounding the whole matter, we find that the parties all agreed to the method adopted for the setting up of the $39,000 in 1944. If this was income, as claimed by Clarence, he is charged with notice that taxes would be due by him on it. Had there been in

his mind at the time the partnership was dissolved any thought that he was going to hold Leicester for the payment of any back income taxes which he might owe on account of this $13,000, it would have been very easy for him to have specifically mentioned it in the agreement. It is probable he did not know about it, or that it did not occur to him, and it is equally probable that Leicester did not know about it, and that it did not occur to him. It is at least doubtful whether the latter would have signed such an agreement had he been aware of the situation to come. However, he is bound by what he signed, but only by what he signed. The contract was drawn by Clarence's attorney, and he was the one who insisted that this contract be drawn by a lawyer. Although it does not differ in its indemnity clause in any particular from the one in the contract in respect to the Three Springs Fisheries, and although its terms in that respect are almost identical with the latter, it may be presumed that the attorney thought it covered sufficiently any claim which was in Clarence's mind. It did not, as we have said, specifically mention any increase in Clarence's own income taxes, and, looking at the circumstances of the case, and the situation of the parties, as well as the wording of the contract, it is difficult to believe or to hold that such taxes were intended to be or were covered. The trial judge said, quite appropriately: "If Clarence wanted an 'iron-clad contract' to protect him against the contingency which happened, he should have demanded that the contract so state. He did not do so—and he does not have the right to ask this court to read it in there for him. It is argued that Clarence had a 'distrust of what the government might say about income tax liability'. If he did, he should have laid his cards on the table, and had a covenant inserted in the agreement, expressly protecting him in the premises. He did not have the right to rely on the ordinary language of such agreements. In other words, he should have walked right in the front door, instead of waiting until the front door

was locked, and then try to get in the back door."

We have not been referred to any cases directly in point, nor have we found any, although a number involving somewhat similar indemnity agreements are annotated in 4 A. L. R. 2d, 1314, *supra,* 21 A. L. R. 108, 58 A. L. R. 621, and 168 A. L. R. 1088. There are, however, cases which involve analogous situations. Thus, in *Codman v. American Piano Co.,* 229 Mass. 285, 118 N. E. 344, there was a covenant by a lessee to pay "all taxes and assessments whatsoever which may be payable for or *in respect of* the leased premises" (emphasis supplied) during the term. The federal income tax law imposed a tax upon a voluntary association which succeeded to the rights of the lessor. This tax was upon the rent paid the association by the lessee. The association sued the lessee under the covenant to recover these taxes. The Supreme Judicial Court of Massachusetts denied the claim, saying: "The legal signification clearly is that the taxes [in respect of the leased premises] are those which relate directly to the premises themselves and not to the rent reserved which, when due, is a separate and independent estate", and, "The words chosen by the parties cannot fairly be extended by us beyond their natural or ordinary meaning, * * *".

The Western Union Telegraph Company, toward the end of the 19th Century, absorbed into its telephone system a number of independent companies by means of long-term leasing of all of their assets. Under these leases, questions arose as to whether the income tax on the rentals was an obligation of the lessor or of the lessee. In the case of *Johnson v. Western Union Telegraph Co.,* 293 N. Y. 379, 57 N. E. 2d 721, one of these cases was before the Court of Appeals of New York. As was the case under, apparently, all of these leases, the rent was to be paid direct to the stockholders of the lessor. The lessor, therefore, was left with no property in its possession, and no money receipts, since the rental payments went to the stockholders. Federal income

taxes, based upon the rent, were assessed against the lessor. The lease provided that the Lessee was to pay all taxes and assessments which might be lawfully imposed upon the property by any state or municipal authorities, and the court said, if that were so, and if the lease said nothing else, the lessor's federal income taxes could not be charged against the lessee because these income taxes were not taxes on property. There was, however, in that lease, an express promise to keep the property clear from all incumbrances arising from tax, assessment, or judgment liens, and that, the court said, bound the lessee to pay these income taxes.

Subsequently, another case involving three similar leases, was decided in the same court, *Western Union Telegraph Co. v. Pacific & Atlantic Telegraph Co.,* 297 N. Y. 124, 75 N. E. 2d 843. In that case, the references to taxes in the three leases were in different forms, but the payments to the stockholders were to be made without any deduction or abatement on account of taxes or assessments. The court said that, inferentially, these clauses called upon the lessee to pay all property taxes, but did not include income taxes, citing for this conclusion the *Johnson* case, *supra,* and the railroad case of *Brainard v. N. Y. C. Railroad Co.,* 242 N. Y. 125, 151 N. E. 152, 154, 45 A. L. R. 751. The rule laid down in the *Brainard* case was quoted as being still the law. That rule was: "Unless the lease expressly provides for the payment of taxes on the income from rentals received under the lease, the imposition of such a burden on the lessee is not justified." In the *Pacific & Atlantic* case, there was held to be no liability on the lessee.

In *N. Y. Central Railroad Co. v. N. Y. & Harlem Railroad Co.,* 297 N. Y. 820, 78 N. E. 2d 612, there had been a number of successive leases of a similar nature, from the Harlem Railroad to the New York Central. The question was whether the lessee had to pay income taxes on the rent paid directly to the stockholders of the lessor. The agreements were to pay taxes on the

railroad branch, or any property of the railroad. The original agreement was made in 1873, there were supplemental agreements in 1882 and 1898, and, for twenty-five years, the court found that the lessee had paid the income taxes. Under these circumstances, the court held that "under a practical construction of the leases adopted. by the parties", the lessee was obligated to pay the income taxes. In quite a late case on the subject of a covenant to pay taxes in a lease, *Northwestern Telegraph Co. v. Western Union Telegraph Co.*, 194 Misc. 352, 85 N. Y. S. 2d 263, in the Supreme Court, Special Term, New York County, there is an extended discussion of the general subject, and the court said that an agreement to pay all taxes assessed on the property of the lessor, and to keep such property free and clear from all liens or encumbrances by reason of such taxes was not sufficient to render the lessee liable.

These cases, while not strictly applicable, as we have said, to the question before us, show that courts generally will not construe an agreement to pay taxes, as including income taxes on individual incomes, unless there is a special and direct statement to that effect. If we assume, as we think we can correctly, that the agreement between the parties in this case contains an obligation to pay *taxes* arising or growing out of the business of the partnership, that nevertheless cannot be broadened or changed by judicial construction to mean an obligation to pay the income taxes of the appellant, unless there is specific language to that effect. Since there is no such specific language, the judgment will be affirmed.

*Judgment affirmed with costs.*