NEW YORK CENTRAL RAILROAD COMPANY, Plaintiff, *v.* NEW YORK AND HARLEM RAILROAD COMPANY et al., Defendants.

Supreme Court, Special Term, New York County, July 3, 1945.

*Paul Folger, Samuel H. Hellenbrand* and *Frederick L. Wheeler* for plaintiff.

*Edward L. McLean* for New York and Harlem Railroad Company, defendant.

*Herman Levine, Louis Kipnes* and *Joseph Nemerov* for Flora Pfeiffer, defendant.

*Frank Weinstein* and *Robert Bernstein* for Samuel Krisberg, defendant.

*Richard Steel* for Grantz & Co., defendant.

*Frank W. Chambers* and *Walter E. Warner* for Westchester Fire Insurance Co., defendant.

*Jacob Jacobson* and *Nathan D. Shapiro* for Bessie Shapero, defendant.

*Carlton S. Conner* for Oliver & Moreland Mortgage Co., defendant.

*Sidney Pepper* and *Benjamin P. De Witt* for Gilman S. Currier, defendant.

BENVENGA, J. In this action for declaratory judgment plaintiff seeks an adjudication that The New York Central Railroad Company (hereinafter referred to as "Central") is not obligated to pay the Federal income and excess profits taxes of The New York and Harlem Railroad Company (hereinafter referred to as "Harlem").

Prior to April, 1873, Harlem owned and operated a steam railroad extending from 42nd Street, in the city of New York, to Chatham Four Corners, Columbia County, It also owned valuable real estate, including Grand Central Station, extending north from 42nd Street along the line of the railroad. By agreement dated April 1, 1873, Harlem leased to Central its steam railroad, together with branch line and other properties, for a period of 401 years. This lease was amended by supplementary contracts in 1882, 1898 and 1943. Under the lease and the supplementary contracts, Central covenanted to pay (1) the interest on Harlem's funded debt; (2) an annual dividend rental of 10% of the par value of Harlem's stock not owned by Central; and (3) certain taxes, charges and assessments imposed or assessed on the demised properties, or upon or against Harlem.

By paragraph Second of the lease, Central agreed to pay " all taxes, charges and assessments, ordinary and extraordinary, that may be imposed or assessed in any way on [Harlem's] railroad, branch or property, or any part thereof, or upon or against [Harlem] by reason thereof."

By paragraph Sixteenth, Central is permitted to exchange any of the demised properties for other properties, to be held by the parties " as if the same were now part of the premises hereby demised "; Central agreeing " to pay all taxes, assessments and charges thereon, and to protect the same against all liens thereon."

And by paragraph Seventeenth, Central promised to surrender the demised properties at the expiration of the lease " in as good state and condition and of as much value, in all respects, as when it received them."

The question presented is whether, under the lease, Central is obligated to pay Harlem's Federal income and excess profits taxes. Specifically, the problem is whether the construction of the lease is governed by the decision in *Brainard* v. *N. Y. C. R. R. Co.* (242 N. Y. 125) or by the decision in *Johnson* v. *Western Union Tel. Co.* (293 N. Y. 379). Central relies upon the *Brainard* case (*supra*), while defendants rely upon the *Johnson* case (*supra*).

1. It is well settled that while a lessor must ordinarily pay his own income taxes or taxes levied on rentals received under the lease, a lessee, by agreement, express or implied, may assume the obligation to pay such taxes and treat the amount so paid as additional rental. (*Brainard* v. *N. Y. C. R. R. Co.*,

*supra; Johnson* v. *Western Union Tel. Co., supra; Woodruff* v. *Oswego Starch Factory,* 177 N. Y. 23.)

As pointed out in the *Brainard* case (*supra,* p. 131): " In actions based on leases and working agreements like the one in question (which for convenience may be called a lease), where the lessee agrees to pay all taxes levied and assessed on or in respect to the property, the distinction between taxes on the income of property and taxes on the property itself has been repeatedly pointed out. With monotonous frequency the courts have held in this connection that a tax on the rents or income of real property is not considered a tax on the property itself."

In the *Brainard* case (*supra*), the lessee agreed to pay (pp. 129–130) " all taxes and assessments which may be levied or become chargeable on said [demised] road or property, or upon the said Mahoning Company [the lessor], by reason of its ownership thereof." It was held that this was a covenant to pay taxes on demised property; that such a covenant is distinct from a covenant to pay income taxes, and that a promise to pay income taxes will not be implied from a promise to pay taxes on demised property. " It follows ", said the court (p. 133), " that the language of the agreement is not sufficiently broad to cover taxes upon the payments to be made thereunder; that it is broad enough to cover the personal liability of the Mahoning Company for taxes on tangible property; and that income taxes are not, in the legal significance of the words used, imposed upon the Mahoning Company ' by reason of ownership ' of the property." In the *Johnson* case (*supra,* p. 384), the lessee promised to pay: (1) " all taxes and assessments which may be lawfully imposed upon said property of the [lessor] * * * or any part thereof, by any state or municipal authorities "; and (2) " keep the same [leased property] clear from all encumbrances arising from tax, assessment or judgment liens ". It was held that, while the first provision applied to property taxes, the second impliedly covered income taxes, and required the lessee to pay the lessor's income taxes to comply with the provisions of the lease. " The later provision * * * as to keeping the property free from *all* tax or judgment liens must have been meant to be all-inclusive * * *. * * * ' these words are sufficient to cover, and must have been intended to cover, *all* possible forms of taxation ' " (p. 384). (Italics supplied in respect to last " all ".)

Distinguishing the *Brainard* case (*supra*), the court pointed out that it does not hold that, to impose on a lessee liability for his lessor's income taxes, the lease itself must refer to " income

taxes " in so many words. " The *Brainard* decision goes to no such extreme. * * * The holding of the case is that words which are commonly used only to describe property taxes cannot fairly be construed to include income taxes." (*Johnson* v. *Western Union Tel. Co.*, 293 N. Y. 379, 385–386.)

2. Applying these principles to the provisions of the present lease, there can be no doubt that Central's promise to pay taxes levied on Harlem's property, or any part thereof (paragraph Second) cannot be considered an agreement to pay its income taxes. So, Central's promise to pay taxes assessed upon or against Harlem " by reason thereof " (paragraph Second) cannot be considered an agreement to pay its income taxes. The phrase " by reason thereof ", in this connection, means " by reason of the imposition or assessment of taxes, charges, and assessments on the demised property or any part thereof ". They import a promise to pay such taxes, whether imposed upon the demised property directly, or upon or against Harlem " by reason of its ownership thereof ". Consequently, the agreement contained in paragraph Second, standing by itself, is an agreement to pay property taxes, as distinguished from income taxes, within the ruling of the *Brainard* case (*supra*).

But a different situation is presented when paragraph Second is considered in the light of paragraph Sixteenth and other provisions of the lease. By paragraph Sixteenth, Central agrees " to pay all taxes, assessments and charges " on properties received in exchange for demised properties; to hold them " as if the same were now part of the premises hereby demised ", and to " protect the same against *all* liens thereon ". Is this a covenant to pay income taxes within the *Johnson* decision (*supra*)?

In the *Johnson* case (*supra*, p. 384), as has been pointed out, the covenant obligated the lessee to pay all taxes and assessments on the demised property, and " keep the same clear from *all* encumbrances arising from tax assessment or judgment liens ". (Italics supplied.) It was held that this required the lessee to pay the lessor's income taxes. It would seem, therefore, that under paragraph Sixteenth, Central is likewise required to pay Harlem's income taxes.

True, under a strict and literal interpretation of paragraph Sixteenth, Central's obligation is to protect only against liens on properties received in exchange for the demised properties. No reason is apparent why the parties should have agreed to such limited protection. However, reading the lease as a whole and in the light of its general plan or scheme, particularly in

the light of paragraph Seventeenth (which requires Central to surrender the demised property and the exchanged properties " in as good state and condition and of as much value, in all respects, as when it received them "), it is manifest that it was the intention of the parties to extend protection not only to the properties originally demised, but also to those received in exchange therefor. In other words, it would seem to have been the intention of the parties that Central should pay all taxes, of whatsoever kind or nature, ordinary and extraordinary, so that Harlem's stockholders would receive a fixed annual sum, in the form of dividends, without any deductions because of income or other taxes.

3. In the *Brainard* and *Johnson* cases (*supra*), it was held that the language of the provisions there involved was " so clear and definite as to admit, as a matter of law, of one construction only ". It is argued that a question of law is likewise presented by the language of the present lease. This contention is made not only by counsel for the plaintiff, but by counsel for the defendants, though they differ in their conclusions. While the question is not free from doubt, it would seem that, if a question of law is here presented, Central is obligated to pay Harlem's income taxes.

But assuming that it cannot be so ruled as a matter of law, the practical construction of the lease by Central clearly justifies that conclusion. The evidence is that, since the Federal income tax went into effect in 1913, Central has not only paid Harlem's income taxes, but has repeatedly stated that it was obligated to do so. Central took that position in its annual reports to stockholders from 1932 to 1939, inclusive, in its reports to the Interstate Commerce Commission and the Public Service Commission of the State of New York, and in proceedings before the Commissioner of Internal Revenue. Indeed, Central continued to take that position even after the decision in the *Brainard* case (*supra*) in 1926. Evidently, the change of position was inspired by the decision of the Circuit Court of Appeals in 1942 in *United States* v. *Warren R. Co.* (127 F. 2d 134).

It is well settled that where the parties to a contract of doubtful meaning, guided by self-interest, enforce it for a long time by a consistent and uniform course of conduct so as to give it a practical meaning, the courts will treat it as having that meaning, even though as an original proposition they might have given it a different one. (*City of New York* v. *New York City Ry. Co.*, 193 N. Y. 543, 548; *Brooklyn Public Library* v.

*City of New York,* 250 N. Y. 495, 501; *Zimmerman* v. *Roessler & Hasslacher Chemical Co.,* 246 App. Div. 306, 315, affd. 272 N. Y. 566.) If, therefore, the language of the present lease be considered doubtful or ambiguous, it must be held, as a question of fact, that it was the intention of the parties that Central should pay Harlem's income taxes.

In reaching this conclusion, I have not overlooked the so-called " without prejudice " letters, which stipulate that Central should pay Harlem's income taxes without prejudice to the rights of either company to claim that the other was obligated to do so under the lease. These letters were exchanged annually between counsel for Harlem and an officer of Central. They began in 1911, before the enactment of the Federal income tax law, and ceased in 1925, before the decision in the *Brainard* case (242 N. Y. 125, *supra*). The letters were never made public, nor, apparently, were they even disclosed to the board of directors of either company. Whether they are admissible seems doubtful. But even if admissible, they can be received only against Harlem, and not against its stockholders. At all events, in the light of the provisions of the lease and of the practical construction placed upon it by Central, the letters are entitled to little or no weight as evidence. (In this connection, I may point out that I have considered Exhibits 4–23, 41, 43, 45–52, and defendants' Exhibits A [except the references to statements in Central's brief] and B.)

4. As has been pointed out, Central's annual reports to stockholders stated that it was obligated to pay Harlem's income taxes and that it had actually paid such taxes. Clearly, these statements, constituted unequivocal representations of fact. They were relied upon by some of the minority stockholders of Harlem not only in purchasing, but in retaining their stock. If Central were permitted to repudiate these representations or statements, the stockholders would suffer substantial damage. Under the circumstances, the application of the doctrine of estoppel would seem warranted.

It is well settled that a party is precluded from repudiating representations or statements of fact which were expressly designed to, and actually did, influence the conduct of another, where such repudiation would operate to the injury of the latter, even though there was no designed fraud on the part of the person sought to be estopped. (*Thompson et al.* v. *Simpson et al.,* 128 N. Y. 270, 288, 289; *Mattes* v. *Frankel,* 157 N. Y. 603, 609.)

It follows that judgment should be rendered against the plaintiff dismissing the complaint, and in favor of the defendants in accordance with the prayer for relief demanded in their answers. Settle judgment.