In the Matter of **PENN CENTRAL TRANSPORTATION CO., Debtor.**
The **FIDELITY BANK et al.**
v.
**PENN CENTRAL et al.**
No. 70-347.

United States District Court, E. D. Pennsylvania.
Oct. 20, 1972.

See also, D.C., 341 F.Supp. 845.

Blank, Rome, Klaus & Comisky by Gilbert Stein, and Gerald Broker, Philadelphia, Pa., for the trustees, Penn Central Transportation Co.

Morgan, Lewis & Bockius by John H. Lewis, Jr., and Christopher K. Walters, Philadelphia, Pa., for The Fidelity Bank.

Tate & Ervin by Wilbur Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford Railroad.

OPINION AND ORDER NO. 980

FULLAM, District Judge.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

Fidelity Bank, a minority shareholder of the New York & Harlem Railroad ("Harlem") has brought this action, derivatively on behalf of the Harlem, challenging the 1873 lease of the Harlem rail assets to the Debtor's predecessors. As amended by stipulation of counsel, the complaint makes the following assertions:

Count 1—The terms of the lease are unconscionable, unfair to the Harlem,

and the lease should therefore be nullified in whole or in part; alternatively, this Court should now fix a fair rental value for the assets.

Count 2—Neither the lease nor subsequent amendments were lawfully approved by the directors and shareholders of the Harlem, or by the appropriate regulatory agencies of the State of New York, hence the lease should be cancelled.

Count 3—The lease should be terminated because of the Debtor's default.

Count 4—This Court should enter a declaratory judgment, declaring that proceeds from the sales of properties covered by the lease may not be used by the Trustees for general railroad purposes, but should be escrowed for the account of the Harlem; and declaring that § 909 of the Business Corporation Law of the State of New York, McKinney's Consol.Laws, c. 4 is applicable to sales of the Harlem properties by the Trustees.

The procedural history of this litigation is somewhat complicated. Fidelity brought suit in the state courts of New York, against the Harlem and its directors, raising many of the foregoing issues. Shortly thereafter, Fidelity petitioned this Court (Document No. 1945) for relief from the stay of suits provisions of Order No. 1 in these proceedings, in order to institute a suit against the Trustees in the New York State courts similar to the present action. By Order No. 456, Fidelity was granted leave to proceed with its suit against the Trustees in the Eastern District of Pennsylvania.

The Trustees of the Debtor filed a petition seeking an injunction against the New York State action; in Order No. 478, Fidelity was temporarily enjoined from prosecuting that litigation. The present action in this Court was filed by Fidelity, and by Order No. 494, D.C. 335 F.Supp. 831, was consolidated into the reorganization proceedings. Finally, by Opinion and Order No. 496, D.C., 335 F. Supp. 832, I made the injunction under Order No. 478 permanent, but granted Fidelity the right to raise the same issues here.

The Trustees then filed a motion to dismiss Counts 1, 2, and 3, on the ground that Rule 23.1 of the Federal Rules of Civil Procedure justified dismissal in the absence of any allegation that Fidelity owned any stock in the Harlem at the time of the wrongs complained of. Since it then appeared that, at least as to some of these counts, continuing wrongs were being alleged, and that the policies underlying Rule 23.1 would not be violated by permitting Fidelity to press its claims, the motion to dismiss was denied (Opinion and Order No. 476).

Thereafter, the case proceeded to trial, non-jury, on a record consisting of stipulations of counsel, oral and documentary evidence followed by extensive oral argument. From this record, I now make the following

## FINDINGS OF FACT

1. The Debtor is the successor in interest to a lease executed in 1873 for the term of 401 years between the New York Central & Hudson River Railroad Company (hereinafter the "Central") and the New York and Harlem Railroad Company. Said lease has been supplemented and amended by agreements dated May 15, 1882 (Supplemental Contract), October 5, 1898 (Second Supplemental Contract), and July 1, 1943 (Third Supplemental Contract.)

2. At the time of the lease, the Harlem had outstanding bond issues secured by mortgages on the Harlem properties.

3. The original lease covered substantially all of the Harlem's railroad property, associated personal property, and contractual rights, but excluded the Harlem's so-called street railroad in New York City, and real property south of 42nd Street in that City. The principal line subject to the lease was comprised of 132 miles of operating property from 42nd Street in New York City to Chatham Four Corners above New York City.

4. The lease was a vehicle chosen to cause the Harlem to "be controlled, managed and operated" by the Central.

5. The rental provisions required payment to the Harlem of $4 per share outstanding, or an 8% return per annum return on the par value of the Harlem stock. Certain tax liabilities of the Harlem were also assumed by the Central.

6. The Central also agreed to pay interest on the mortgage obligations of the Harlem then outstanding, and to pay the principal of all mortgages except the Consolidated Mortgage which was to mature in 1900. As to the latter, the Central agreed to pay the principal if the Harlem did not do so. In the event the Central did pay the principal of the Consolidated Mortgage, the Harlem agreed that at the request of the Central the Harlem would issue bonds in like amount. The agreement also required the Harlem to issue new bonds when and if any refunding issue matured and was paid by the Central.

7. The Central was granted a power of sale over the properties subject to the lease which were not necessary for the railroad operations, subject to an accounting for the proceeds at termination of the lease in due course or in the event of termination for default, with a set off for real property acquired by the Central from its own funds for operation of the Harlem lines. An equivalent provision covering personal property required that at termination the Central "deliver to [the Harlem] personal property of similar kind and equal in value."

8. At the time the lease was executed the Central did not own any shares of the Harlem stock, but three of the directors of the Central served on the Harlem's 13-member board.

9. The Harlem shareholders approved the 1873 lease on May 16, 1882, by a vote of 139,856 shares for and none against.

10. In 1882, the parties executed a Supplemental Contract which provided that neither the directors nor shareholders of the lessee or lessor could effectuate any change in the first or second articles of the original lease, and that the rental reserved by the original lease was to be paid during the entire term.

11. In 1882 the Central owned no stock of the Harlem, but six of the directors of the Central served on the Harlem 13-member board.

12. The Harlem shareholders approved the 1882 Supplemental Contract on May 16, 1882, by a vote of 139,856 shares for and none against.

13. On June 1, 1897, the Harlem 3½% Gold Mortgage was executed securing a bond issue not to exceed $12 million maturing in the year 2000. The Gold Bond issue was for the purpose of refunding the Harlem's 7% Consolidated Mortgage, which was to mature on May 1, 1900.

14. A dispute and litigation arose between the Central and the Harlem over who would benefit from the 50% reduction in interest costs ($420,000 per annum) occasioned by the 3½% Gold Bond rate versus the 7% rate on the consolidated bonds which were refunded by the Gold Bond issue.

15. The Second Supplementary Contract was executed on October 5, 1898, in settlement of the litigation instituted by the Central, pursuant to which:

a. The Central litigation was terminated;

b. The rental payment per share was increased by $1 per annum, thereby raising the return at the par value of each share to 10%;

c. Central agreed to tender the funds to pay the Consolidated Mortgage at maturity, and in turn the Harlem agreed to issue to the Central bonds under the Gold Bond Mortgage equal to Central payments;

d. The original lease obligation to pay the Harlem's funded debt was modified to reflect an unconditional obligation on the part of the Central to pay the Consolidated Mortgage and any refunding mortgage or mortgages.

16. In 1898 the Central owned no stock of the Harlem, but seven of the

directors of the Central also served on the Harlem's 13-member board.

17. The Harlem shareholders approved the Second Supplemental Contract (1898) on October 5, 1898, by a vote of 145,519 shares for and 11,042 against.

18. In 1943, a dispute and ensuing litigation arose concerning the Central's obligations under the original lease to pay income and excess profit taxes of the Harlem. The Central contended that any such payments made on behalf of the Harlem were to be subtracted pro rata from the $5 per annum dividend rental. In 1942, said payments on behalf of the Harlem were $330,630.

19. The Third Supplemental Contract to the original lease as theretofore amended was executed as a means of amicably settling this dispute. Under the Third Supplemental Contract:

a. The Central terminated its litigation;

b. The Harlem agreed to issue $7,800,000 in principal amount of Second Mortgage Bonds to be purchased by the Central;

c. $2,500,000 of the purchase price of the bonds were to be turned over by the Harlem to the mortgage trustee of the Harlem Gold Bond Mortgage to be used as a sinking fund to retire but not cancel Harlem Gold Bonds. The mortgage trustee was to receive interest on the retired bonds;

d. The remaining $5,300,000 in purchase price was waived by the Harlem in consideration of the Central's release of all claims for past due tax payments, cancellation of certain Harlem debts arising from operation of the street railroad during the 1920's, and the costs incurred by the Central in the bond issue and associated formalities;

e. The $7,800,000 in principal amount of Harlem bonds acquired by the Central were to be used for an exchange offer to the non-Central shareholders of the Harlem on a basis of $125 principal amount of 4% bonds for each share of Central stock;

f. 4% on $125 returned $5 per annum to the holder, the equivalent of the return to the stock under the rental provision of the lease as modified;

g. The Second Mortgage was specified as constituting, for the purpose of the lease as modified, a refunding of the Harlem Gold Bond Mortgage, and, hence, the Harlem Gold Bond Mortgage could not be refunded again;

h. Central agreed to pay the interest and principal of the Second Mortgage bonds; and

i. The lease was modified to require payment of the $5 per annum per share only to non-Central shareholders of the Harlem. The Central's Harlem stock had been pledged as security for the Central's Refunding and Improvement Mortgage of 1913. The lease provided that suspension of rental payments to the Central as shareholder would not apply if the R&I mortgage trustee was not required under the mortgage to turn over stock dividends on pledged stock to the Central.

20. By 1943, the Central owned 23,119 shares of the Harlem's 26,879 outstanding preferred and 114,321 of the 173,121 outstanding common.

21. Eight of the Harlem's 13 directors in 1943 also served on the board of the Central.

22. The Harlem shareholders approved the Third Supplemental Contract (1943) on August 5, 1943, by a vote of 174,525 for and 2,951 against.

23. Outside independent counsel was retained to act as counsel to the Harlem relating to the 1943 dispute, and they recommended acceptance of the agreement by the Harlem.

24. The Central and Harlem submitted in support of their petition under § 20(a) and § 5(2) of the Interstate Commerce Act, the Third Supplemental Contract and Second Mortgage along with summaries of the terms of said contract and mortgage.

25. Fidelity offered exhibits 7 and 10 secured from the files of the Central.

The documents purport to be a reconstruction of the property transactions from 1876 to 1953 involving the property covered by the 1873 lease.

26. The documents recite that about 90 sales or exchanges of property to third parties or to condemning authorities took place in the period 1876 to 1953.

27. The documents further recite that in most instances the proceeds were delivered to the Harlem and then transferred to the Central for application toward additions and betterments to the Harlem line. The total consideration received aggregated $1,875,129.39.

28. On July 1, 1970, a $2.50 semi-annual rental dividend came due, and on January 1, 1971, a second semi-annual dividend came due.

29. The directors of the Harlem at the time the reorganization petition was filed and thereafter were employees of the Debtor.

30. An officer of the Harlem made formal demand on the Trustees for payment of the rental dividends mentioned in Finding No. 28, on March 29, 1971.

31. The two rental dividend payments mentioned in Finding No. 28 were paid by the Trustees on April 30, 1971. Neither payments were within the 90-day grace period of the lease.

32. The semi-annual rental dividend payment due July 1, 1971, was paid by the Trustees to the Harlem on October 8, 1971. It appears subsequent payments were made in due course.

33. Real Estate taxes payable annually by the Debtor on Harlem properties (not including tax payable by tenants pursuant to the leases or orders of this Court) are approximately $1,700,000. Tax liabilities in this sum have been accruing and remain unpaid since the filing of the Debtor's reorganization petition.

34. The indenture trustee of the Harlem Mortgages has declared a default under the mortgage and accelerated the principal of the bonds premised on the failure of the Harlem to meet tax obligations. The Trustees' failure to pay taxes assessed against Harlem property constitutes a default under the lease.

35. Since the reorganization petition was filed, the Trustees have failed to pay corporate taxes assessed against the Harlem. The total sum due is substantially less than $50,000.

36. Pursuant to New York State legislation, the Harlem rail lines were relocated underground in the early years of this century.

37. The Central has developed the residual surface rights. In most instances, the Central executed long-term ground leases and the lessee constructed the improvement.

38. The Harlem has some reversionary interest in the following Park Avenue Properties:

Air rights over Grand Central Station

Pan Am Building

Roosevelt Hotel

383–84 Madison Avenue

250 Park Avenue

270 Park Avenue (Union Carbide Building)

280 Park Avenue—East Building (Bankers Trust Building) approximately 25% of the fee interest.

230 Park Avenue—one of the tenants in common

320 Park Avenue (ITT Building)

350 Park Avenue (Manufacturers Hanover Trust Company Building)

277 Park Avenue (Chemical Bank Building)

39. The annual rental received by the Trustees attributable to their leasehold rights in the above properties is $9 million.

40. In the early months of 1971, the Trustees became aware of the fact that revenues from Harlem leasehold properties substantially exceeded rental payments. The Trustees knew that defaults had occurred under the lease as modified.

41. The appraised value of the property rights (if owned in fee by one party) set out in Finding No. 38, excluding

the value of improvements constructed by ground lessees, is $105 million.

42. The estimated value of the Harlem rail facilities on a going concern reproduction cost new less depreciation basis is $450 million, and assuming termination of all rail operations is $60 million.

43. The Trustees have executed agreements of sale covering 230 Park Avenue, 280 Park Avenue (East Building) and 350 Park Avenue. Said agreements contemplate conveyance of the underlying fee interest free of the Harlem's reversion under the power of sale contained in the original lease.

44. All subsurface rights necessary to continue operation of the Harlem rail line are reserved by the agreements of sale.

45. The Trustees do not intend to submit the proposed agreements to the board of the Harlem.

46. The Trustees do not intend to set aside the proceeds of the sales of the three properties mentioned in Finding No. 43 for the benefit of the Harlem.

47. The Trustees have petitioned to affirm the Harlem lease on the condition that all defaults be cured. Said petition does not contemplate that the principal of the Harlem bonds be paid, or that the dividend rental attributable to the Debtor's Harlem stock be paid.

48. Fidelity Bank is a bank and trust company organized under the laws of the Commonwealth of Pennsylvania, with its principal office at Broad and Walnut Streets, Philadelphia, Pennsylvania.

49. Before purchasing its Harlem stock in 1962, Fidelity knew that New York Central owned approximately 92% of Harlem's stock.

50. Before purchasing its Harlem stock in 1962, Fidelity knew that the majority of officers and members of the board of directors of Harlem were officers and members of the Board of Directors of New York Central.

51. Before purchasing its Harlem stock in 1962, Fidelity made no inquiries as to what rights it would have as a minority shareholder of the Harlem.

52. Before purchasing its Harlem stock in 1962, Fidelity knew that the Harlem was a leased line with all of its assets under lease to others.

53. Before purchasing its Harlem stock in 1962, Fidelity knew that there existed a lease of Harlem properties to New York Central.

54. Before purchasing its Harlem stock in 1962, Fidelity made no effort to learn the terms of Harlem's lease of properties to New York Central.

55. Before purchasing its Harlem stock in 1962, Fidelity made no effort to learn whether the Harlem lease of properties to New York Central had been approved by the directors or the stockholders of Harlem.

56. Before purchasing its Harlem stock in 1962, the only appraisals, reports, recommendations or other data Fidelity had relating to the value of Harlem stock were the daily over-the-counter market bid and asked quotations and the description of the Harlem contained in Moody's Railroad Manual.

57. The reason Fidelity purchased its Harlem stock in 1962 was so that it could have on its books a sale of stock which it had been holding as collateral security for a loan, which loan had become in default, in order to liquidate the loan.

58. Despite a nationally advertised public auction in 1962, no bids of substance were received for the Harlem stock Fidelity had been holding as collateral, thus requiring Fidelity to buy the stock itself in order to liquidate the loan, so that it (Fidelity) would be able to write off the balance of the loan.

59. Before Fidelity bought its Harlem stock in 1962, Fidelity did not learn specific details concerning (a) what assets the Harlem owned; (b) what leases were in existence involving property owned by the Harlem; and (c) the terms of the April 1, 1873 lease and the supplements and amendments thereto.

60. From the date of its purchase of Harlem stock until July 1971, Fidelity

made no inquiry as to what assets the Harlem owned.

61. From the date of its purchase of Harlem stock until July 1971, Fidelity made no inquiry as to what leases were in existence involving property owned by the Harlem.

62. Fidelity's Senior Vice President and Treasurer, William G. Kurtz, Jr., has served as Portfolio and Money Manager for Fidelity during the entire period Fidelity has owned Harlem stock.

63. Mr. Kurtz's duties as Portfolio and Money Manager included receipt of, and response to, all notices of shareholders' meetings of the Harlem.

64. Mr. Kurtz never made any inquiries as to how the board of directors of the New York and Harlem Railroad Company was elected.

65. During the time he has been Portfolio and Money Manager, Mr. Kurtz has never made any inquiries as to the terms of the April 1, 1873 Harlem lease or as to the terms of any supplement or amendment thereto.

66. During the time Fidelity has owned its Harlem stock, Fidelity has regularly received notices of Harlem shareholders' meetings.

67. On only one occasion, in about the 1963–1965 period, has Fidelity ever sent a representative to attend a Harlem shareholders' meeting.

68. The purpose of Fidelity's attendance at the one shareholders' meeting was to obtain a first-hand report of the progress of the company.

69. During the time Fidelity has owned its Harlem stock, it has consistently decided to exercise its voting rights as a Harlem shareholder in favor of the Harlem management.

70. During the time Fidelity has owned its Harlem stock, Fidelity has annually reviewed and approved its continued retention of said stock.

71. In late Summer of 1971, Fidelity knew of the terms of the Harlem lease concerning the lessee's right to sell Harlem real estate.

72. After he learned in the Summer of 1971 of the Harlem's lessee's right to sell Harlem real estate, Mr. Kurtz had no discussions with any bank officers as to the advisability of continued retention by Fidelity of its Harlem stock.

73. Despite learning of the terms of the Harlem lease concerning the right of the lessee to sell Harlem real estate, Mr. Kurtz believed that Fidelity should continue to retain its Harlem stock.

74. Notwithstanding his judgment that the terms of the Harlem lease, concerning lessee's right to sell real estate, were adverse to the value of the stock, Mr. Kurtz nonetheless believed the Harlem stock represented an investment worth retaining by Fidelity.

75. In deciding that the Harlem stock should be retained after the Summer of 1971, Mr. Kurtz gave considerable weight to the dividends being received by Harlem shareholders, and the fact that there was a continuous record of payment of those dividends.

76. Since Fidelity has owned its Harlem stock, it has been paid all dividends to which it has been entitled as the owner of Harlem stock.

77. Since Fidelity has owned its Harlem stock, Fidelity has never refused to accept a dividend payment received on said stock.

# I

## DISCUSSION

The Trustees have raised the affirmative defenses of the statute of limitations, laches, *res judicata*, and collateral estoppel. Before reaching these issues, however, I find it necessary to reexamine my earlier ruling denying the Trustees' motion to dismiss.

█ In connection with the entry of Order No. 476, the "contemporaneous ownership" issue was framed as an application of Rule 23.1. Upon further reflection, however, I have concluded that the issue is one of substantive law, rather than procedure; that, whatever may be said of the propriety of my interpre-

tation of Rule 23.1, Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires the application of the substantive law of the State of New York; and that, under New York law, Fidelity is barred from asserting the claims set forth in Counts 1 and 2 of its complaint. Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Phelps v. Burnham, 327 F.2d 812 (2d Cir. 1964); McClure v. Borne Chem. Corp., 292 F. 2d 824 (3d Cir. 1961); 3B J. Moore Federal Practice, ¶ 23.1.15[2]. Under § 6 of the New York Railroad Law (48 McKinney's § 6; 1972 Supp. McKinney's Consol.Law c. 49), § 626 of the Business Corporation Law of New York (6 McKinney's § 626) is applicable to this action. Section 626(b) imposes a requirement "that [the plaintiff shareholder in a derivative action must be] such holder at the time of the transaction of which he complains". Fidelity did not acquire its Harlem stock until 1962 (and did not then acquire it by operation of law, so as to stand in the same position as if it had acquired the stock earlier), and thus is unable to litigate transactions occurring before 1962. Chaft v. Kass, 19 A.D.2d 610, 241 N.Y.S.2d 284 (1963); 13 Fletcher, Cyclopedia Corporations § 5982 (1970 ed.) and cases cited therein.

But because of the difficulties encountered in attempting clearly to distinguish between Fidelity's status in this derivative action, and Fidelity's right to be heard in the reorganization proceedings, because of the desirability of resolving the merits of the issues raised, and because the merits have been fully presented for decision, I shall proceed to dispose of the case on the merits. For similar reasons, I have decided to dispose of all of the issues raised, even though, as hereinafter discussed, I have concluded, alternatively, that as to some issues the affirmative defenses asserted by the Trustees are a bar to their assertion.

Over the years, minority shareholders of the Harlem have instituted and prosecuted to judgment four separate actions involving the Harlem lease or amendments thereto. In Continental Ins. Co. v. New York & Harlem Ry. Co., 187 N. Y. 225, 79 N.E. 1026 (1909), a minority shareholder brought a derivative action to annul the Second Supplemental Contract (Finding No. 15). The Second Supplemental Contract divided between the Central and the Harlem the $420,000 annual benefit resulting from the 50% reduction in interest rate that was achieved by refinancing the Harlem Consolidated Mortgage by means of the 3½% Gold Bond Mortgage. The agreement increased the dividend rental by $1 per share ($200,000 annually), enabling the Central to retain the balance of the savings on bond interest (approximately $220,000 annually). Judgment in favor of the defendants was affirmed on appeal, on the basis that the settlement agreement was honestly entered into, and that shareholder approval of the agreement was effective and binding.

In Boyd v. New York & Hudson R. R. Co., 220 F. 174 (2 Cir., 1915), a minority shareholder sought to preclude the Central from acquiring enough Harlem stock to enable Central to force a merger of the two corporations under New York law. The court held that consolidation and forced exchange of Central stock for Harlem stock would amount to a breach of the lease, in that the Harlem shareholders' right to an annual dividend would be converted into an equity position in the Central, subject to the same risks applicable to all other Central shareholders. "Consolidation [and exchange of stock] would therefore mean not only an exchange of shares of one name for shares of another, or of a thing of one kind for another thing of the same kind, but involve a complete destruction of investment in character and quality." 220 F. at p. 181.

By 1932, the development of the New York business district had radically changed, the Harlem rail lines had been relocated underground, and the Central was in the process of developing the surface and air rights for non-rail pur-

poses. In Phoenix Ins. Co. v. New York & Harlem R.R. Co., 59 F.2d 962 (2d Cir.), cert. denied, 287 U.S. 645, 53 S.Ct. 91, 77 L.Ed. 558 (1932), minority shareholders of the Harlem challenged the Central's right to retain and spend income generated by leasing the surface rights, and to dispose of property covered by the lease by sale or exchange. The district court found that the Central was entitled to the rents from the surface property, and that under the lease the Central could properly exchange excess properties by substituting properties of equal value, or could sell excess properties subject to an accounting of the proceeds without interest, at the termination of the lease. (Trustees' Exhibit D–3(c) (e)). The Second Circuit affirmed. With respect to the income, the court observed, "Of course, the Central must make such leases of the property as will not interfere with or cause injury to the reversion." 59 F.2d at 964. A similar conclusion had been expressed by the district court. On the issue of disposition of excess property, both courts rejected the plaintiff's contention that Central had violated the lease by exchanging certain properties in connection with street relocation and improvements made by the City of New York. It was pointed out that, in the absence of allegation or proof that the property received was not equal in value to the property exchanged, the Harlem shareholders had not been injured thereby.

And finally, in Wendlinger v. New York & Harlem R. R. Co., an unreported decision ('Trustees' Exhibit D–1), affirmed without opinion, 280 App.Div. 758, 113 N.Y.S.2d 641 (1952), a minority shareholder filed a derivative action attacking the propriety of the Third Supplemental Contract of 1943 (Finding No. 19), on the ground that the Central had breached its fiduciary duty to the Harlem's minority shareholders, and that shareholder approval of the 1943 agreement was obtained without adequate disclosure. Earlier, it had been decided that under the lease, Central was obligated to pay federal taxes levied against the Har-

lem, New York Central Ry. Co. v. New York & Harlem R. R. Co., 185 Misc. 420, 56 N.Y.S.2d 712 (1945); aff'd, 297 N.Y. 820, 78 N.E.2d 612 (1948). The court in *Wendlinger* found that disclosure of the tax dispute and other relevant circumstances made to the Harlem shareholders in connection with approval of the Third Supplemental Contract "set forth fully and fairly all relevant particulars of the proposed transactions, and were not sent to the Harlem shareholders in pursuance of or in furtherance of any fraudulent or wrongful purpose." (D–1, pp. 103–04; 110–11.) Invoking the doctrine of collateral estoppel on the basis of the judgment in the *Phoenix* case, *supra*, the court also rejected contentions concerning alleged misuse of the proceeds from sales of excess property.

The contention of the Trustees that all of the above cases, taken together, bar any present assertion that the original lease was unfair, is an overstatement. The Trustees' reliance on Schuylkill Fuel Corp. v. B & C Nieberg Realty Corp., 250 N.Y. 304, 165 N.E. 456 (1929), is misplaced. In that case, the court (Cardozo, Ch. J.) held that an earlier judgment construing the terms of a contract did not constitute a bar to later action seeking to rescind the contract, as thus interpreted, on the basis of mutual mistake. Assuming that Schuylkill Fuel still represents the law of New York, *see* Weinstein, Korn & Miller, New York Civil Practice, § 5011.14, it would seem that the doctrine of *res judicata* does not preclude Fidelity from contesting the legality of the original lease or subsequent amendments. However, the doctrine of collateral estoppel does, of course, preclude reconsideration of any issue of law or fact that was litigated and determined in the previous actions.

Fidelity argues that the *Phoenix* and *Wendlinger* cases have little or no present weight, because in both actions counsel entered into extensive stipulations concerning authenticity of documents and certain factual matters. Fidelity contends that the *res judicata* and collateral estoppel effect of consent judg-

ments or the equivalent is minimal. I agree. However, the stipulations in those cases do not extend to all of the issues which were considered and decided by those courts. To the extent that those courts, on the basis of adversary proceedings, entered judgments construing the basic contract, collateral estoppel would apply. As discussed below, I find that some of Fidelity's present claims are, on collateral estoppel grounds, not open for reconsideration.

## II.

*Count 1.* In this count, Fidelity seeks cancellation of the 1873 lease, or a determination of a new rental which would be fair and equitable. Section 213(a) of the New York Civil Practice Law and Rules (CPLR) establishes a six-year limitation period for actions seeking equitable relief. *See* 1 Weinstein, Korn & Miller, New York Civil Practice, ¶¶ 213.01, 213.07. Fidelity contends that this limitation period is inapplicable, since continuing wrongs have been done to the Harlem, and separate causes of action accrue each year.

■ Where rescission or reformation is sought on grounds of fraud or mistake, the courts of New York have generally held that the precise form of fraud or mistake determines whether the statutory period commences at the time of the transaction, or at the time of discovery of the alleged fraud or error. Weinstein, Korn & Miller, New York Civil Practice, ¶¶ 213.18, 213.25. For present purposes, however, it suffices to note that the Harlem and its shareholders were fully aware of the relevant facts at the time the lease was executed. Therefore, Fidelity's claims are barred by the statute of limitations, unless its "continuing wrong" theory is valid.

■ Fidelity relies principally upon the case of Ripley v. Int'l. Railways of Central America, 8 N.Y.2d 420, 209 N.Y. S.2d 289, 171 N.E.2d 443 (1960). There, minority shareholders alleged that United Fruit Company had breached its fiduciary duty to the minority shareholders of IRCA by exercising its control of the latter corporation in order to achieve a contract between United Fruit and IRCA fixing unreasonably low shipping charges for United Fruit's products. Although the contract was entered into in 1936, and suit was not filed until many years later, plaintiffs were permitted to recover the price differential for the six years preceding the filing of suit. The court specifically found that United Fruit had actual control of IRCA when the rate contract was executed; that the contract contained a provision permitting adjustments to the original rate during the course of the agreement; that the rate feature of the contract was unrelated to other contractual arrangements between United and IRCA entered into at the same time; and that United was under a continuing fiduciary duty to minority shareholders of IRCA throughout the entire period of the contract. For present purposes, the significant feature of the Ripley case is the determination that the rate agreement was independent of the other parts of the contractual arrangements, and that the rates were open to renegotiation throughout the term of the contract. Some of the original 1936 contracts had been ratified by the shareholders, but the rate agreement was never submitted to the shareholders for approval. The court did not rescind the contract, but permitted recovery of damages on an unjust enrichment theory for the six-year period before the suit was filed, on the basis of United's breach of its continuing fiduciary duty not to prevent IRCA from attempting to renegotiate the rates. Thus, application of the rationale of *Ripley* requires a holding that Fidelity's claims are time-barred, since, even if there had been a fiduciary duty on the part of Central in 1873, the only violation of that duty was the execution of the lease in 1873. *See also,* Petition of Reilly, 17 Misc.2d 1077, 156 N.Y.S.2d 478 (Supreme Ct.N.Y.1956) (rescission of a trust agreement on the grounds of settlor's incompetency barred by statute of limitations; statutory period commenced at the execution of the trust agreement);

Northerly Corp. v. Hermett Realty Corp., 15 A.D.2d 888, 225 N.Y.S.2d 327 (1st Dept. 1962) (suit to reform contract barred by limitations; period of limitations commenced on the date of delivery of the contract).

■ A related defense asserted by the Trustees is the doctrine of laches. It can scarcely be doubted that the passage of nearly 100 years has severely prejudiced the Trustees in developing facts to counter the charge that the original rental provided in the lease was unconscionable. On its face, this is a classic example of a situation in which laches should be applied.

■ Moreover, it is interesting to note that in the *Boyd* case, *supra,* the Harlem shareholders took the position that the lease was so advantageous to the Harlem that the Central should be enjoined from any attempt to merge the Harlem into the Central. Although election of remedies is a somewhat outmoded procedural doctrine, I have no difficulty in concluding that minority shareholders of Harlem should not now be permitted to assert a position so diametrically opposed to the position they succeeded in vindicating through litigation in 1915. Economic cycles may affect motivation, but they cannot undo history.

Alternatively, I have concluded that, even if Fidelity's challenge be regarded as timely, it is lacking in merit.

■ Fidelity, on the basis of *Ripley, supra,* asserts that the burden of proof is on the Trustees to demonstrate the fairness of the lease. However, at most, that doctrine would apply only if Central dominated and controlled the Harlem at the time the lease was executed. The evidence here is to the contrary. At the time of the lease, three of the thirteen members of the Harlem board were also directors of the Central. The *Ripley* decision does not suggest that this set of facts would be sufficient to shift the burden of proof to the Trustees. Be that as it may, New York's Business Corporation Law, in § 713(a) and (b) provides just the opposite. Under that statute, where the fact of interlocking directorships is disclosed, a transaction which is approved by the directors and shareholders of a corporation may not be set aside for that reason.

■ Irrespective of all of the foregoing issues, I am satisfied that the evidence presented demonstrates that the 1873 lease was in fact fair. The lease has been analyzed and discussed in detail in the related opinion concerning the Park Avenue sales. A brief recapitulation is sufficient here.

It is apparent that the 1873 lease was designed to accomplish a consolidation of the rail operations of the Harlem and the Central. In exchange for the Central's obligation to pay the dividend rental and associated monetary obligations, Harlem leased its entire steam railroad plant to the Central for a term of 401 years. All risks concerning profitability, financing, and improvements to the road—in short, all entreprenurial risks—were placed on the Central. Central was given authority to deal with the property as it saw fit, so long as its treatment of the property was consistent with continued rail operations, and consistent with Central's obligation to restore to the Harlem, at the expiration or earlier termination of the lease, an operable rail facility in as good condition, and of as much value, as at the time of the original lease.

In conformity with these objectives, Central was permitted to dispose of parts of the property no longer needed for rail operations, either by exchange or by outright sale. Title to property received in exchange was to be placed in the Harlem's name, subject to the lease. If the Central sold parts of the property, Central was to keep the proceeds until the termination of the lease, at which time Central was to account to Harlem for these proceeds, without interest. Conversely, Central was required to pay all expenses of maintaining the railroad, and all costs involved in acquiring any additional property which might be needed for that purpose. Upon termination of the lease, Harlem was to have the right to choose whether or not

to keep any such additional property which had been purchased by the Central. If it chose to keep the property, Harlem was to reimburse Central's costs, again without interest.

It must be remembered that the lease rental included fixed annual dividends on the Harlem stock, in an amount representing what was undoubtedly then regarded as an excellent return on the full market value of the shares. From the standpoint of the Harlem, it was almost as if the Central had bought and paid for the railroad, and had also promised to give it back eventually.

Fidelity argues that the Park Avenue Properties are now worth $105 million and that the present rental return, $5 per share, is grossly inadequate. Assuming the Harlem's total assets were $105 million, a dividend of $5 per share would be a return of 1% of the asset value of each share per year. The fallacies inherent in this approach are quite apparent. It was not the Harlem's money which went into development of the properties to produce the enhanced values. By opting for the fixed-return, no-risk status embodied in the 1873 lease, the Harlem shareholders effectively removed themselves, for the duration of the lease, from the vicissitudes and fortunes of the economic arena. There is surely nothing irrational in the choices which were made in 1873, nor the slightest suggestion of unfairness. Indeed, for many decades the Harlem shareholders thought well of their 1873 bargain, and, in the Boyd case, supra, successfully rejected the notion that they should cast their lot with the Central. So far as the present record discloses, it may well be that most of the minority shareholders of the Harlem, even today, have no quarrel with the provisions of the lease.

Fidelity challenges the Third Supplemental Contract of 1943 on the grounds that Central's claim against the Harlem which was settled thereby was totally lacking in merit, and that shareholder approval of the compromise settlement agreement was based upon inadequate disclosures. This precise contention was rejected in the Wendlinger case, supra, and is now barred by collateral estoppel. Moreover, if I were to decide the issue independently, I would agree with the Wendlinger decision. A reading of New York Central Ry. Co. v. New York & Harlem R. R. Co., 185 Misc. 420, 56 N.Y. S.2d 712 (1945), aff'd 297 N.Y. 820, 78 N.E.2d 612 (1948) produces the inescapable conclusion that Central's claim was far from frivolous. There was a legitimate dispute, and the compromise settlement was properly approved by the shareholders after adequate disclosure. Moreover, the settlement was supported by a legal opinion rendered by an independent law firm of high repute, which had been brought in for the very reason that Central was then in a position to control the Harlem.

In short, on the merits of Harlem's claim set forth in Count 1 of its complaint, as amended, I find in favor of the defendants.

### III.

*Count 2.* Fidelity seeks to cancel the lease and its supplements on the ground that none of these documents has ever been approved by the New York Public Service Commission (PSC). This contention may be disposed of rather quickly.

In the first place, at the time the 1873 lease, the Supplemental Contract, and the Second Supplemental Contract were executed, there was no such requirement. Section 148 of the New York Railroad Law (113 N.Y.L. c. 565, vol. 2, 115 N.Y.L. c. 676; 116 N.Y.L. c. 433; 128 N.Y.L. c. 695) merely prohibited a railroad lessee from doing anything inconsistent with the legal obligations of the lessor at the time of the lease. It was not until 1907 that the Public Service Commission was created. Section 54 of the Public Service Commission Act of 1907 (130 N.Y.L. c. 429; 47 McKinney's p. VII) imposed for the first time a statutory requirement that a railroad lease be approved by any regulatory body. Section 148 of the

Railroad Law was amended in 1925 to bring it into conformity with the Public Service Commission Law, by imposing a specific requirement that railroad leases be approved by the Commission (148 N.Y.L. c. 562).

In the second place, the holding of the Second Circuit in Phoenix Ins. Co. v. New York & Harlem R. R., 59 F.2d 962 (2d Cir. 1932) that these leases are valid under New York law, precludes relitigation of this issue.

With regard to the Third Supplemental Contract executed in 1943, this was in fact submitted to and approved by the Interstate Commerce Commission (Trustees' Exhibit D–5). It appears that, pursuant to § 5(2)(b) of the Interstate Commerce Act, the Commission gave due notice of the application to the Governor of New York, and that no objection was raised by any state agency.

In Transit Commission of State of New York v. United States, 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075 (1932), not cited in the briefs, the Supreme Court held that an order of the Interstate Commerce Commission pursuant to the Federal Transportation Act, approving a trackage agreement between two rail carriers, preempted the authority of the New York Transit Commission (successor to the PSC), under § 148 of the New York Railroad Law. Thus, there is simply no basis for Fidelity's present argument.

One further circumstance should be mentioned. In 1943, it was the position of the ICC that only the lessee or vendee of rail property was required to obtain approval of a lease or acquisition. Erie R. R. Co. et al. Purchase, 254 ICC 486 (1943); in short, that a railroad lessor was not a necessary party to a proceeding pursuant to § 5(2)(a) of the Transportation Act (49 U.S.C. § 5(2) (a)). In connection with its order approving the Third Supplemental Contract in 1943, the ICC dismissed Harlem's application for authority to lease its properties. Such dismissal is of no consequence in the present case. Presumably,

it was based upon the ICC's conclusion that Harlem's application, with respect to the 1943 agreement, was unnecessary, since it already had plenary jurisdiction over the transaction based on the Central's application. In any event, as set forth above, Harlem's properties had been leased at a time when no regulatory approval was required, or even possible.

Fidelity further contends that the Supplemental Contract of 1882 is void because it is contrary to the public policy of the State of New York, in that it purports to disable the parties from amending the first and second articles of the original lease. Fidelity further contends that, somehow, this alleged impropriety of the 1882 Supplement serves to render the original lease void. The latter argument is an obvious non sequitur. A holding that the 1882 Supplement contravened public policy and was therefore void would merely eliminate the restrictions against amendment of the original lease.

The plain purpose of the 1882 Supplement was to benefit the Harlem by preventing future reductions in the dividend rental. This is borne out by the Second Supplemental Contract of 1898, which increased the dividend rental by some 25%, with the approval of all parties.

The further modification of the lease in 1943 is consistent with both Article Second of the original lease and the 1882 agreement. It merely eliminated the unnecessary step of having Central pay dividend rentals on all of the Harlem's outstanding stock, and then having the Harlem repay to the Central the dividends on the Central's Harlem stock.

Count 2 of the complaint also contains allegations charging that approval of the various contracts by the directors and shareholders of the Harlem was not obtained in accordance with applicable state law. There is no evidentiary support for these charges, and they have apparently been tacitly withdrawn.

For all of the foregoing reasons, on the issues raised on Count 2 of plaintiff's

complaint, as amended, I find in favor of the defendants.

## IV.

*Count 3.* In this count, Fidelity seeks to terminate the Harlem lease because of defaults which have occurred since reorganization. The Trustees have brought current their payments of the dividend rental, interest on the Harlem bonds, and other obligations imposed by the lease, but are in default in the payment of certain real estate taxes.

All of these issues have been dealt with at length in my Opinion dealing with the Park Avenue sales (Opinion and Order No. 974, 354 F.Supp. 717), filed concurrently herewith. For the reasons set forth in Part I(A) of that Opinion, incorporated herein by reference, I have concluded that the Harlem may not now terminate the lease.

Accordingly, on the issues raised by the third count of plaintiff's complaint, as amended, I find in favor of the defendants.

## V.

*Count 4.* In this count, Fidelity seeks a declaratory judgment to the effect that the Trustees may not sell any of the Park Avenue Properties covered by the Harlem lease except with the consent of the Harlem board, and that the Trustees may not sell any of these properties without according to the minority shareholders of the Harlem their appraisal rights under §§ 909 and 910 of the New York Business Corporation Law. For the reasons set forth in Part I(C) of my Opinion in the Park Avenue sales matter (Opinion and Order No. 974, 354 F.Supp. 717), incorporated herein by reference, I have concluded that the proposed sales are authorized under the power of sale provisions of Articles Sixteenth and Seventeenth of the lease, and that such sales, when consummated, terminate Harlem's reversionary interest. It follows that the cited sections of the Business Corporation Law of New York have no application, since the Harlem is not disposing of any of its assets. Moreover, based on the values set forth in Finding No. 42 herein, the cited statutory provisions would not be applicable in any event.

Fidelity has raised some further contentions which have not been disposed of elsewhere. The argument is that, even assuming the Trustees may convey the fee interest in property no longer necessary for rail operations, the power of sale is limited to situations in which the security of the reversion would not be diminished. I believe this interpretation of Article Sixteenth and Seventeenth of the lease would do violence to the clear language of the power of sale. Whenever property is sold and the proceeds made available to the lessee without restriction, the reversionary interest of the lessor extends to diminished physical assets. But the lease clearly gives the lessee that right, and imposes a corresponding obligation to account for the proceeds. The accounting provision would be meaningless, if Fidelity's position were accepted.

The Central is given the right to sell surplus property on whatever terms and conditions it sees fit, so long as they are "not inconsistent with the rights of the [Harlem]". And the rights of the Harlem which must be observed are clearly set forth in the lease itself.

The lease carefully distinguishes between exchange of property and outright sales. In the case of exchanges, the Central must be sure to get back property of equal value. In the case of outright sales, Central's only obligation is to pay over the proceeds, without interest, at the termination of the lease. Both of these sets of provisions are entirely consistent with the overall objective of the parties, namely, to make sure that at the termination of the lease, the Harlem would be restored to an operable rail system worth at least as much as the system it parted with in 1873.

In the case of exchanges, the parties could conceivably have achieved the same result by requiring the Central, at the termination of the lease, to account to

the Harlem for any difference in the values of the properties exchanged, instead of imposing upon the Central a current obligation to make sure that the property received was worth at least as much as the property conveyed. But any such approach would have involved serious practical difficulties, and it is quite understandable that the parties should have concluded that questions of relative valuation of exchanged properties could best be determined at the time of the exchange, rather than many years, or even centuries, later. Moreover, under the terms of the lease Central would be unlikely to engage in exchanges of property unless the acquired property was needed for rail operations.

In the case of outright sales, however, the parties specifically and in detail provided that the only obligation of the Central was to account for the proceeds, without interest, at the end of the lease.

Fidelity contends that the practice of the parties to apply proceeds from the sale of excess property toward additions and betterments to the Harlem line precludes the interpretation of the lease set out above. (Findings Nos. 26 to 29.) I rejected a similar argument by Morgan Guaranty in conjunction with the Park Avenue sales controversy. (Opinion and Order No. 974, I(B)(1), 354 F.Supp. 717).

Taking Fidelity's evidence at face value, it is inconclusive. Completion of the sale transactions were facilitated by having the Harlem execute the deeds, and since the Central had the responsibility to pay for "A's and B's," the source of the funds was irrelevant to the Central. It should be noted that the total of the proceeds over the entire 70-year period amounted to less than two years of the dividend rental payable under the lease, and the average amount of the proceeds available per year was only $25,000. In short, even if the lease were unclear, which it is not, the course of conduct relied on is equivocal.

I therefore am constrained to reject Fidelity's contention that the lease should be interpreted as mandating Harlem's consent before any sales could be carried out, in order to prevent diminution of the value of its reversion. The lease clearly contemplates that Harlem's only reversionary interest in property sold by the Central is limited to its claim against the Central for the proceeds, without interest, upon termination. Stated otherwise, the conclusion is that the exercise of the power of sale terminates Harlem's reversionary interest in the property sold.

Harlem of course has the right to require that no sales be made which would interfere with rail operations on the demised premises. Such was the precise holding in Phoenix Ins. Co. v. New York & Harlem R. R. Co., *supra.* It is clear that the sales presently proposed would not violate this requirement.

Finally, both the *Phoenix* and *Wendlinger* cases, cited above, resulted in judgments interpreting the Harlem lease as creating in the Central a power to sell excess property with the sole obligation of accounting for the proceeds at the end of the term. In application of the doctrine of collateral estoppel, Fidelity is precluded from relitigating these issues.

Another point raised by Fidelity requires but brief mention. The contention is that the Park Avenue Properties are necessary to the operation of rail service over the demised premises, since the income from the properties is needed by the Trustees to support rail operations. However, Article Sixteenth of the lease provides:

"During the continuance of the said term, [the Central may] sell and dispose of such part of the demised premises and property as may not be necessary for the use of the said demised railroad and branch. . . . "

The issue is whether the properties are needed for rail service, not whether income from the properties (or proceeds) are needed to reduce deficits. Under the terms of the lease, the Harlem has no

concern either with revenues from rail operations, or with the source of funds used to defray costs. No one has suggested an evidentiary basis for any contrary conclusion.

For all of these reasons, on the issues raised in Count 4 of the plaintiff's complaint, as amended, I find in favor of the defendants.

## VI.

To summarize, for the reasons outlined above, I have reached the following

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter.

2. Venue in this District is proper.

3. Fidelity is barred from asserting the claims set forth in Counts 1 and 2 of its complaint, as amended, because it was not an owner of Harlem stock at the time of the wrongs complained of.

4. The claims alleged in Counts 1 and 2 of plaintiff's complaint, as amended, are barred by the statute of limitations.

5. The claims alleged in Counts 1 and 2 of plaintiff's complaint, as amended, are barred by laches.

6. The claims set forth in Counts 1 and 2 of plaintiff's complaint, as amended, and plaintiff's claim for declaratory relief under Count 4 of the complaint, as amended, to the extent that plaintiff seeks a declaration that the consent of Harlem is required before any sales can be consummated, and that the proceeds from sales must be held in escrow, are barred by application of the doctrine of collateral estoppel.

7. The 1873 lease and its supplements are not unconscionable or unfair to the Harlem.

8. Neither the 1873 lease nor any of its supplements is invalid or voidable for failure to obtain approval thereof by any regulatory agency; all requisite regulatory approvals were obtained.

9. Exercise by the Trustees of the lessee's power of sale under the 1873 lease terminates any interest of the Harlem in the properties sold.

10. The Park Avenue Properties may be sold by the Trustees without the approval of the Harlem.

11. The Park Avenue Properties may be sold by the Trustees without according appraisal rights to the minority shareholders of Harlem.

12. Harlem may not terminate the lease; the lease is valid and subsisting.

13. Harlem does not have the right to restrict or control the use by the Trustees of the proceeds from the sale of Park Avenue Properties.